Ken HINCHEY, Appellant,

v.

Vida F. HINCHEY, Appellee.

No. 3528.

Supreme Court of Alaska.

March 13, 1981.

William Van Doren, Anchorage, for appellant.

Joseph Palmier, Palmier & Stohr, Anchorage, for appellee.

Before RABINOWITZ, C. J., MATTHEWS, J., and HANSON and STEWART, Superior Court Judges.

## OPINION

RABINOWITZ, Chief Justice.

The parties to this appeal were married in Reno, Nevada, in August of 1967. Vida Hinchey filed for divorce on February 4, 1976, on the ground of incompatibility of temperament. At the time the action was decided, Ken Hinchey was 63 and Vida Hinchey was 48. Vida Hinchey testified that she was a housewife during her marriage to Ken Hinchey. She graduated from high school, and worked intermittently as a long distance operator for telephone companies from 1945 until 1957, accumulating twelve years of seniority. From 1962 until her marriage to Ken Hinchey, she worked as a waitress at the Washington Athletic Club in Seattle. Vida Hinchey testified that she thought it would be difficult for her to return to work as either a waitress or phone operator, because of her age and because of technical changes in the phone equipment. She also testified that she had been licensed to sell real estate in Washington, and had sold real estate for nine months to a year.

Ken Hinchey did not testify at the trial. His occupation is businessman-investor. At the time of the marriage in 1967, he was the owner of Alaska Aggregate Company (hereafter Alagco). This business was sold in 1974, and subsequently Ken Hinchey invested in a gold dredging company, Alaska Minerals and Exploration, Limited (hereafter AMEL). At the time of trial, AMEL's success was still speculative. Ken Hinchey had also invested in a potential lease site of property of the Alaska Railroad.

Vida Hinchey had four children from a prior marriage. These children, and their

ages at the time of trial, were: James, 22; Mark, 20; Jeffrey, 18; and Matthew, 16. All four children were adopted by Ken Hinchey. There was one child, Clark Errol, born of the parties' marriage. Although custody of Clark was originally contested, Ken Hinchey states in his trial brief that he does not contest the child's custody. This child was born with a minor motor disability, and attended a special public education facility. It is anticipated that his education will continue at regular public schools.

The major issue before the superior court and this court on appeal is centered on the superior court's property division. Vida Hinchey brought no assets to the marriage. Alagco was Ken Hinchey's separate property at the time of the marriage; estimates of Alagco's value in 1967 ranged from $800,000 to $1,600,000. A special master was appointed to determine the current assets of the parties.[1]

The superior court determined that the increase in Alagco value was a marital asset, and that even if not, the asset should be invaded. The superior court divided the property and provided for support as follows: Vida Hinchey was awarded $2,500 per month support until she remarries or reaches 60; $1,000 per month if 60 and not remarried; $25,000 per year from the Alagco contract salary, starting in 1978 through 1983 (see n. 25 infra); $200,000 from the Alagco contract balloon payment in 1984 (see n. 24 infra); the parties' Hillcrest home, subject to its mortgage; $5,000 for repair of Hillcrest home; $6,000 for purchase of a car; $25,000 for attorney's fees; $2,500 for Jeffrey's dental work;

$2,238 for payment to the special master; and $4,000 for past support owed. Ken Hinchey was awarded all of the stock and assets of AMEL; all of the stock of Alaska Glacier, Inc.; the Alagco salary payments remaining after payment of the support ordered by the superior court; and the Alagco contract payments after deduction of the $25,000 annual award to Vida Hinchey for the period 1979–1983 and after deduction of Vida's $200,000 from the 1984 balloon payment. In addition, Ken Hinchey was ordered to pay $350 per month child support for Clark, until age 23, or as long as he is dependent, and $250 per month each for Matthew and Jeffrey, through age 19, and $150 per month each through age 23, if they are full-time students.[2] This appeal followed.

Before addressing the property division issues, we turn first to the other issues which Ken Hinchey has raised in this appeal.

## I.

### IS THE SUPERIOR COURT'S ORDER REQUIRING KEN HINCHEY TO PAY SUPPORT BEYOND THE AGES OF MINORITY OF HIS CHILDREN, IF THEY WERE ENROLLED IN SCHOOL, ERRONEOUS?

As indicated previously, the superior court ordered Ken Hinchey to pay $150 per month for Matthew and Jeffrey from age 19 through age 23 as long as they are full-time students. Ken Hinchey argues that support beyond age 19 is prohibited by Alaska's age of majority statute.[3] We

---

1. Ken Hinchey filed objections to the master's report, but objected only as to the collectibility of a $25,000 note due him from "Ed Dole," and the $200,000 valuation of AMEL. No motion was made for a separate hearing on the master's report.

2. During the course of the trial, it was discovered that the superior court's file was missing. Neither counsel requested that the file be reconstructed. Immediately after trial, it was discovered that Ken Hinchey, with his trial counsel's cooperation, had signed a confession of judgment in favor of a Mr. Droege, and that this judgment had been executed against funds

in the Alaska Mutual Savings Bank. Neither Mr. Rice (Ken Hinchey's trial counsel) nor Ken Hinchey disclosed during trial that the funds had been removed. After a hearing on this matter, the superior court imposed a trust on all funds Mr. Hinchey was to receive from Alagco to secure the support ordered and the property division.

3. At the time the superior court entered its judgment in the case at bar, AS 25.20.010 provided:

A person is considered to have arrived at majority at the age of 19 years, and thereafter has control of his own actions and busi-

think appellant's reliance is misplaced. AS 09.55.210, which provides child support, states in pertinent part that:

> In a judgment in an action for divorce or action declaring a marriage void or at any time after judgment, the court may provide
>
> . . . .
>
> (2) for the payment by either or both parties of an amount of money or goods, in gross or installments, as may be just and proper for the parties to contribute toward the nurture and education of their children . . . .

In our view, that part of AS 09.55.210 which provides that the parties may be ordered to provide for the "nurture and education of their children" is controlling. It is of particular significance that the statute was not drafted to read "nurture and education of minor children" for then post-majority support would be clearly prohibited. Lacking such an express limitation, we think the term "children," in the context employed, is ambiguous and thus subject to judicial construction.[4]

Other Alaska statutes pertaining to custody of children specify whether they are applicable to minor children. AS 09.55.205 provides, in part, that "[T]he court may . . . make an order for the custody of or visitation with the minor child. . . ." Similarly, AS 09.55.200 authorizes the court, during the pendency of the action, to enter orders "for the care, custody, and maintenance of the minor children of the marriage. . . ." We conclude that a reasonable construction of AS 09.55.210 allows for the continuation of educational support of children beyond the age of majority.

This conclusion is supported by the decision in *French v. French*, 117 N.H. 696, 378 A.2d 1127 (1977). The New Hampshire court ordered the college fees paid for two children after they had reached the age of majority. The New Hampshire court reasoned that the word "minor" did not appear in the custody and support statute, and that the legislature would have included "minor" if it had intended to limit support to minor children. An extensive discussion of this question is contained in *Childers v. Childers*, 89 Wash.2d 592, 575 P.2d 201 (1978).[5] There the applicable Washington statute required parents to support "dependent children to whom a duty of support is owed." This was a departure from the predecessor statute which provided support for minor children. The Washington court concluded that the children involved were dependent and were owed a duty of support for education if their parents could reasonably afford it, and under the facts of the case ordered post-majority educational support for the minor children.[6]

---

ness and has all the rights and is subject to all the liabilities of citizens of full age, except as otherwise provided by statute.
In 1977, this statute was amended changing the age of majority to 18 years.

4. *Poulin v. Zartman*, 542 P.2d 251, 270 (Alaska 1975). Examination of the legislative history of AS 09.55.210 has failed to shed any light on the question of legislative intent.

5. *See Domestic Relations—Post-Minority Child Support In Dissolution Proceedings—Childers v. Childers*, 54 Wash.L.Rev. 459 (1979).

6. In R. Washburn, *Post-Majority Support: Oh Dad, Poor Dad*, 44 Temp.L.Q. 319, 329 (1971), the author reviews, with approval, the developing trend toward post-majority educational support in divorce settlements, and concludes:
Whether the disability is internally or externally caused, the child whose parents are still married will most often continue to receive support after majority. To terminate support when the parents are divorced creates a special disadvantage not shared by children whose parents remain together. If the father could have been expected to provide advanced education for his child, it is not unfair to expect him to do so after he has been divorced. However, if the father will in some way be disadvantaged by requiring continued support, this harm must be weighed against the advantages to the child. For instance, it is conceivable that a father who thinks he had no duty to support his children after 21, may decline a higher paying job or other advancement in expectation of termination of support. In such a case, it may be inequitable to continue the obligation. Of course, if the rule of automatically terminating support at majority were abolished, the father could not justifiably rely on it.
From society's point of view, setting a child on his own at age 18 or 21 may do him real harm. A few decades ago, when advanced

We therefore conclude that the superior court did not err in ordering Ken Hinchey to pay $150 per month to both Matthew and Jeffrey from age 19 to age 23 if they are full-time students.[7]

## II.

### DID THE SUPERIOR COURT ERR IN ITS DENIAL OF KEN HINCHEY'S MOTION FOR APPOINTMENT OF A GUARDIAN AD LITEM?

■ The superior court is authorized by the provisions of AS 09.65.130 to appoint a guardian ad litem to represent a minor child.[8] In *Lacy v. Lacy*, 553 P.2d 928, 930 (Alaska 1976), we said:

Under AS 09.65.130(a) the superior court is vested with discretion to appoint a guardian ad litem. Further, this court has suggested that in custody proceedings a guardian ad litem should be appointed when appointment would substantially enhance the likelihood that the '... individual needs and interests of the children would be adequately represented.' The decision whether to appoint a guardian ad litem would appear to depend in large

measure on the age of the children and the nature of the claim being advanced by the parent or parents. [footnotes omitted]

Of further relevance is *Veazey v. Veazey*, 560 P.2d 382, 385 (Alaska 1977), where we stated:

[T]here will be many custody cases in which a guardian will not be needed, and in such cases neither the statute, the court rules, nor our decisions compel the court to waste its time and money, as well as that of the parties and counsel, in employing one.

At trial, counsel for Vida Hinchey made the statement that "there is no issue with respect to the custody of the one minor child Clark...." Counsel for Ken Hinchey did not take issue with this statement.[9] There was no evidence that Clark Errol was not receiving proper care or that his condition would improve if custody were to be changed. Vida Hinchey testified that she understood that it was important for children with learning disabilities to feel loved and wanted, and that she had done this for

Clark, Matthew and Jeffrey during both their minority and post-majority ages.

---

**8.** AS 09.65.130(a) provides:

The court may, upon the motion of either party or upon its own motion, appoint an attorney to represent the minor with respect to his custody, support, and visitation or in any other legal proceeding involving his welfare. When custody, support, or visitation are at issue in a divorce, it is the responsibility of the parties or their counsel to notify the court that those matters are at issue. Upon notification, the court shall determine whether the child should have legal representation or other services and shall make a finding on the record before trial. The court shall enter an order for costs, fees, and disbursements in favor of the child's attorney and may further order that other services be provided for the protection of the child.

**9.** Counsel for Ken Hinchey subsequently stated:

I will bring to the court's attention the fact that in the preparation of this trial, pretty much at my own instigation and pretty much almost over the top of my client's opinions, I move this court to have a guardian ad litem appointed ....

---

education was not as common as it is today, children had to support themselves at an early age. Today, since children remain in school longer, they frequently do not mature or become self-sufficient until later in life. It is unfair, merely because the parents are divorced, to set a child on his own before he is fully equipped by modern standards. [footnotes omitted]

**7.** This holding encompasses our further conclusion that the superior court did not abuse its discretion in awarding these sums, for it is not unreasonable to expect someone with Ken Hinchey's anticipated income to contribute to his children's college expenses. Hinchey must pay $150 per month for Matthew and Jeffrey past their majority only if they are full-time students. The $350 per month payments will continue for Clark until Clark is 23 or as long as he is dependent. Because of Clark's motor disability and the unlikelihood that he would be able to pursue a manual trade, it is reasonable to assume that someone in Mr. Hinchey's financial position would enable Clark to obtain sufficient special training and education to assist him in overcoming his handicap.

In light of our review of the entire record, we find no abuse of discretion in the amounts of child support the superior court awarded for

Clark.[10] The superior court denied the motion for appointment of a guardian ad litem, stating:

I'll deny the motion to appoint a guardian ad litem. I find that it's untimely and further there's been nothing raised thus far which would alert me to a problem which I believe would—that requires the protection that a guardian ad litem provides.[11]

Based on the foregoing, we hold that the superior court did not abuse its discretion in denying Ken Hinchey's motion for appointment of a guardian ad litem for the parties' minor child.

### III.

### DID SERIOUS AND PREJUDICIAL IRREGULARITIES OCCUR WHICH PREVENTED KEN HINCHEY FROM OBTAINING A FAIR TRIAL ON THE MERITS?

Essentially, five arguments are advanced in support of this specification of error. Since we have concluded that each is lacking in merit, they will receive truncated treatment.

A. *Withdrawal of $25,843.50 from the Alaska Mutual Savings Bank.*

█ Ken Hinchey contends that he was seriously prejudiced by the actions of his trial counsel who apparently cooperated in obtaining a confession of judgment from him in contravention of the superior court's order. However, the fact that the funds were withdrawn was not known by the superior court until after the judgment in the case at bar had been entered. Therefore, the alleged misconduct of Ken Hinchey's trial counsel could not have affected the trial or the superior court's judgment.

B. *Failure of Defendant Ken Hinchey to Testify.*

10. This testimony was uncontroverted.

11. In denying Ken Hinchey's motion for a new trial, the superior court specifically found that:
Mrs. Hinchey has been a housewife and mother since the marriage and has been an especially attentive mother to Clark.

█ At the time that Mr. Hinchey was scheduled to testify, his counsel stated:

Your Honor, I—I have been struggling with the problem of my client's health and I have discussed the matter with him as to whether or not he feels well enough to attend. He does not want the matter to come to a close, he feels it has to be resolved for his and for Mrs. Hinchey's sake. And we do not feel that he could add any more to I think what the court has before it. If the court wishes his presence for information that the court may feel is needed, I'll be glad to—to bring him in. But as it is right now I don't think that it would—it would profit the court.

Mr. Hinchey has produced no evidence showing that he was induced not to testify; on the contrary, he participated in making the decision. Further, Mr. Hinchey cites no authority for the proposition that he is entitled to a new trial because of his attorney's mistake in not having him testify. Thus, we find this point without merit.

C. *Trial Counsel's Fatigue and Lack of Preparation.*

█ Ken Hinchey asserts that the superior court erred in not granting a new trial based on the affidavit of his trial counsel, Mr. Edmond Rice, that Mr. Rice was fatigued and not prepared for trial. This argument was not raised until after the trial was over. At the outset of the trial, the superior court questioned respective trial counsel as follows:

THE COURT: This is the time set for trial in case number 76–889, Hinchey versus Hinchey. Mr. Palmier, is the plaintiff ready to proceed?

MR. PALMIER: Ready for the plaintiff, Your Honor.

THE COURT: And Mr. Rice for the defendant?

. . . .

That Clark's motor disability does not mandate placing him in a special boarding school in order to better equip him to meet life's challenges, on the contrary a stable home is more important.

MR. RICE: I'm ready, Your Honor.

Ken Hinchey's trial counsel made no motion for continuance and failed to raise the issue before the superior court. We therefore decline to address the question in this appeal.

D. *Proceeding Without the Superior Court Files.*

■ During the course of the trial, it was discovered that the superior court file was missing.[12] Vida Hinchey's counsel offered assistance in reconstructing the file, if necessary, and the superior court also agreed to reconstruct the record if it became necessary to do so. Ken Hinchey's counsel made no objection to proceeding with the trial without the court file. Given this circumstance, we do not consider the question to be properly before us.[13]

E. *Objections to Master's Report.*

■ Ken Hinchey contends that the superior court erred in not holding a hearing on his "Objections to Master's Report." However, Alaska Rule of Civil Procedure 53(d)(2) provides:

In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6(d). The court after hearing may adopt

the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

The record shows that Ken Hinchey did not file a motion for a hearing on his objections to the master's report. Since Mr. Hinchey failed to make a proper record before the superior court, the point is not properly before us.[14]

## IV.

## DID THE SUPERIOR COURT ABUSE ITS DISCRETION IN ITS PROPERTY DIVISION?

A. *Did the Superior Court Err in Awarding Vida Hinchey Pre-coverture Property?*

■ Ken Hinchey contends that the superior court erred in not restricting its property division to property acquired after coverture, and that the major increase in Alagco's value at the time of sale in 1974 was due to appreciation of Ken Hinchey's pre-coverture investment in the company, and thus not subject to division. In this regard, he attempts to analogize Alaska marital property to community property. He argues that in California, a community property state, appreciation of property owned prior to marriage remains separate property for purposes of a divorce settlement, if the increase in value is a result of capital rather than services of the spouse. His conclusion is that any increase in value of Alagco resulted from appreciation of the precoverture capital, and is therefore his "separate property."

---

12. The record, in part, reflects the following:
    MR. PALMIER: Your Honor, I'm informed that—and Mr. Rice was informed this morning that perhaps the court doesn't have the file. We—both of us were so....
    THE COURT: I have not had the file whatsoever in this case. I've had some papers, the trial brief, and of course, the master's report as it's been supplemented by the new sheet number 2. The court system doesn't seem to have the file, Mr. Palmier. They haven't had the file—or nobody knows where the file's been since I believe it was in Judge Moody's chambers.

13. Additionally, we note that the superior court had available to it the master's report, the trial

briefs, and copies of documents submitted by the parties. Although Mr. Hinchey asserts that the court took judicial notice of the missing file, the "judicial notice" referred to in his brief was of the order appointing the master; a copy of that order was offered to the court. Ken Hinchey points to no other place where judicial notice of the file was taken.

14. Ken Hinchey objected to two of ten findings, and had the opportunity to cross-examine the special master on all of his findings before they were accepted by the superior court. Thus, Mr. Hinchey, in spite of his failure to notice his objections for hearing, was afforded a full hearing on those objections during trial.

We think AS 09.55.210 is dispositive of this contention. This statute provides, in part, that "the court, in making the division, may invade the property of either spouse acquired before marriage when the balancing of the equities requires it. . . ." Thus, the superior court may invade a pre-marital asset in the interest of equity.[15] In its initial findings of fact, the superior court determined that the Alagco contract was a marital asset.[16] The court further stated:

> The Court further finds that the majority of the increase in the value of the business known as ALAGCO occurred during the course of the marriage and is thus a marital asset. The court specifically adopts the Master's Findings and position and the position espoused by Plaintiff in this regard and specifically finds that even if he were to reject the Master's Position and adopt the position espoused by the Defendant in his trial brief, the Court nevertheless would invade the assets of the Defendant as hereinbefore and hereinafter stated.

Based on the foregoing, we conclude that Mr. Hinchey's argument that the Alagco contract was a pre-marital asset is not germane to this appeal, as the superior court was empowered to reach the subject asset in the interest of equity whether or not it was acquired prior to the parties' marriage.[17]

**B.** *Did the Superior Court Err in its Property Division?*[18]

■ This is the major issue in this case. Our standard of review in these matters was set forth in *Crume v. Crume*, 378 P.2d 183, 186 (Alaska 1963). There we stated:

> [W]ith respect to the judicial division of the property in this case, that is a matter left by statute to the broad discretion of the trial court and will not be disturbed on appeal unless an abuse of such discretion is shown. To establish an abuse of discretion the aggrieved party must show that the property division was clearly unjust. [footnotes omitted][19]

In reaching its rulings concerning property divisions, the trial court should apply the following factors, which were first articulated in *Merrill v. Merrill*, 368 P.2d 546, 547–48 n. 4 (Alaska 1962):

> [T]he respective ages of the parties; their earning ability; the duration and conduct of each during the marriage; their station in life, the circumstances and necessities of each; their health and physical condition; their financial circumstances,

---

**15.** *See Ross v. Ross*, 496 P.2d 662 (Alaska 1972); *Vanover v. Vanover*, 496 P.2d 644 (Alaska 1972).

**16.** Findings of fact and conclusions of law VI–A reads:

> The court finds that the assets of this marriage at the time of the divorce are as follows:
>
> A. Defendant has a receivable from the sale of a business known as Alaska Aggregate Corporation.

**17.** In light of this conclusion, we need not reach appellant Ken Hinchey's contention that the superior court erred in determining Alagco's worth at the time of the marriage.

**18.** AS 09.55.210 empowers the trial court to make a division of the parties' property. Where pertinent, it provides:

> In a judgment in an action for divorce or action declaring a marriage void or at any time after judgment, the court may provide
> . . . .
> (6) for the division between the parties of their property, whether joint or separate, acquired only during coverture, in the manner

as may be just, and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property of either spouse acquired before marriage when the balancing of the equities between the parties requires it; and to accomplish this end the judgment may require that one or both of the parties assign, deliver, or convey any of his or her real or personal property to the other party; . . .

**19.** This standard was reiterated in *Vanover v. Vanover*, 496 P.2d 644, 645 (Alaska 1972), where we said:

> We have consistently held that . . . [AS 09.55.210(6)] vested the trial court with broad discretion in the matter of division of the parties' properties and that on appeal we would not disturb the trial court's determination unless it is shown that the property division was clearly unjust.

*See also Stroecker v. Stroecker*, 428 P.2d 384, 386 (Alaska 1967); *Groff v. Groff*, 408 P.2d 998, 1000 (Alaska 1965); *McSmith v. McSmith*, 387 P.2d 454, 455 (Alaska 1963).

including the time and manner of acquisition of the property in question, its value at the time and its income producing capacity if any. [footnotes omitted] [20]

With these criteria in mind, we turn to the merits of the property division specification of error. Initially, we list the assets, their valuation, and their division, according to the findings and judgment of the superior court:

| Assets | Value | Ken Hinchey share | Vida Hinchey share |
|---|---|---|---|
| Hillcrest home [21] | 62,458 | –0– | 62,458 |
| Lakeside house receivable [22] | 39,000 | 20,400 | 18,600 |
| Insurance | 9,094 | 9,094 | –0– |
| Attorney fee refund | 4,541 | 4,541 | –0– |
| Glacier Pilot dividend | 1,000 | 1,000 | –0– |
| 5000 shares Alaska Glacier stock [23] | ? | ? | ? |
| 110 shares Peoples Bank & Trust | 3,520 | –0– | 3,520 |
| Alaska Railroad Industrial Park lease investment | 10,000 | 10,000 | –0– |
| AMEL loan | 200,000 | 200,000 | –0– |
| Alagco – contract payments [24] | 1,781,111 | 1,581,111 | 200,000 |
| Alagco – salary [25] | 350,000 | 200,000 | 150,000 |
| Subtotal | 2,460,724 | 2,026,146 | 434,578 |
| **Liabilities** | | | |
| Attorney's fees [26] | (25,000) | (15,000) | (10,000) |
| Dental work [27] | ( 2,500) | –0– | ( 2,500) |
| Master's fee [28] | ( 2,238) | –0– | ( 2,238) |
| Back taxes [29] | (40,000) | (40,000) | –0– |
| Total Liabilities | (69,738) | (55,000) | (14,738) |
| Second Subtotal | 2,390,986 | 1,971,146 | 419,840 |
| **Transfers** | | | |
| Ken Hinchey to Vida Hinchey [30] | (no effect) | (15,000) | 15,000 |
| TOTAL | 2,390,986 | 1,956,146 | 434,840 |

20. We have consistently considered these factors in determining the correctness of judicial property divisions. *See Vanover v. Vanover*, 496 P.2d 644, 648 (Alaska 1972); *Stroecker v. Stroecker*, 428 P.2d 384, 386 (Alaska 1967); *Groff v. Groff*, 408 P.2d 998, 1001 (Alaska 1965).

21. The Hillcrest house was found to have an appraised value of $112,000 with a mortgage balance of approximately $49,542. It was given to Vida Hinchey.

22. The receivable from the sale of the Lakeside home was about $39,000. Of this amount, $18,600 was already due at the time of the order, $10,500 was due Sept. 1, 1977, and the last $10,000 was due March 1978. Of this, Vida Hinchey was apparently to receive $18,600.

23. The Master indicated that there were only five shares. The court below listed the asset as 5000 shares. As no one attempted to assign a value to the stock, this discrepancy is not material. The stock is only listed here for the sake of completeness.

24. This asset was derived from the sale of Ken Hinchey's business, Alaska Aggregate Company. The contract of sale provided for several different methods of payment of the sale price owed to Ken Hinchey. The total purchase price (exclusive of the salary provision, noted below) was $2,612,000. The contract provided for a down payment of $200,000; ten annual payments of $161,200 (through 1984), and, in 1984, a balloon payment of $800,000. At the time of trial, the superior court found that there was a balance of $1,781,111 remaining to be paid on the contract. Ken Hinchey had obtained an advance on some of the annual payments, and thus each of his payments until 1981 was to have $38,000 deducted to repay this, and his 1982 payment was to have the remaining $8,000 deducted. Of the total, Vida Hinchey is to receive $200,000 at the final balloon payment.

25. As partial payment for the Alagco sale, Ken Hinchey was to receive a "salary" of $50,000 per year for ten years from the date of sale. At the time the superior court's order was entered, there remained seven years or $350,000, to be paid. Of this, Vida Hinchey is to get $25,000 per year for the years 1978–1983. Under federal tax law, these would not be classified as "periodic payments" since they represent installment payments on a specified sum paid over a period of less than 10 years. IRC § 71(c). As such, they are taxable to Ken Hinchey and not included in Vida Hinchey's gross income. *Id.* This is to be contrasted with the alimony order of $30,000 per year, which is taxable to Vida Hinchey and deductible for Ken Hinchey. IRC §§ 61(a)(8), 71(b), 215. Ken Hinchey's payments for the support of the minor children are taxable to Ken and not taxable to Vida. IRC § 71(b).

26. Although Ken Hinchey was to pay these fees, the court ordered that $10,000 of that amount be paid from the proceeds of the Lakeside house sale and the Peoples Bank & Trust stock, which was transferred from Ken to Vida Hinchey. Since we have assigned those stocks to Vida, that portion of the debt must be assigned to her also.

27. See note 27 on page 306.
28. See note 28 on page 306.
29. See note 29 on page 306.
30. See note 30 on page 306.

Ken Hinchey disputes several aspects of the valuation. He asserts that the AMEL loan and the Alaska Railroad lease investment were worthless; that the superior court erred in its valuation of the parties' liabilities; that the Alagco contract was not properly discounted over time; and, most important, that the tax consequences of the Alagco contract were not taken into account.

As to the tax consequences, there are several conflicting statements before us. At trial, Mr. Sherwood (Ken Hinchey's accountant) testified that the gain on the sale of Alagco was approximately 100%, with that return divided as 70% long-term capital gains and 30% short-term capital gains. He also testified that the total tax cost of the Alagco sale had been estimated at $900,000. In an affidavit supporting Ken Hinchey's motion for a new trial, Mr. Sherwood indicated that Ken Hinchey's total tax liability for the years 1977 through 1984 would be $1,147,743. Ken Hinchey, in his brief, would have us add $160,000 to this figure, apparently assuming that the $1,147,743 represents the tax on the contract payments only, not on the Alagco salary component of the transaction.

Ken Hinchey presented to the trial court, in his motion for new trial, his contention that the court had not taken into account the tax consequences of the Alagco sale. The superior court rejected this; using a rate of 35% (which it estimated as the capital gains rate for state and federal taxes combined), it estimated the taxes on the 1978 payment, as an example, as follows: the $123,000 payment, together with the already-paid $38,000 advance, brings the total constructive payment to $161,200. Applying the 35% rate to this leaves over $60,000 from the $123,000 payment, of which Vida Hinchey receives $25,000 as her share. As to the separate alimony payments, the superior court noted that these would be taxable to Vida Hinchey and a deduction for Ken Hinchey. The superior court also specifically rejected Mr. Sherwood's $1,147,743 figure, in favor of the testimony at trial that the total Alagco tax liability would be $900,000.

We begin by rejecting Ken Hinchey's highest figure, that of $1,307,743 ($1,147,743 plus $160,000). This appears to be a patent attempt to artificially inflate the tax figure. Mr. Sherwood's affidavit characterizes the $1,147,743 as "taxes to be paid by Mr. Hinchey for 1977 through 1984," without limiting this sum to the Alagco contract payments.

We also decline to use the $1,147,743 figure proffered in Mr. Sherwood's affidavit. The superior court emphasized that no attempt was made to reconcile this figure with the $900,000 figure given at trial. On appeal, appellant asserts that the discrepancy is due to the fact that the $900,000 figure for the total tax liability was calculated on the basis of joint return rates, whereas the $1,147,743 was calculated on the basis of single individual rates, applicable after the divorce. See IRC §§ 1(a), (c). Our own calculations indicate that this accounts for only part of the discrepancy. We can hazard a guess that the remainder of the discrepancy is due to the fact that Mr. Sherwood made his calculations without

27. Again, Ken Hinchey was liable, but the bill was to be paid from the Lakeside and Peoples Bank & Trust stock assets. See note 26 supra.

28. See notes 26 and 27 supra.

29. Ken Hinchey alleges that liability for back taxes was not taken into account by the lower court. The superior court apparently found a back tax liability of $40,000 for which the order places the liability on Ken Hinchey. Estimates by Mr. Nangle and Mr. Sherwood (two accountants who testified at trial) varied ($150,-000 to $250,000, testimony of Mr. Nangle;

$100,000 to $200,000, testimony of Mr. Nangle; about $80,000, testimony of Mr. Sherwood). Apparently this back tax liability was the reason for the money being held in the Alaska Mutual account, which Ken Hinchey withdrew to pay some AMEL bills.

30. The order lists the following payments to be made by Ken Hinchey to Vida Hinchey from the marital estate:

| | |
|---|---|
| For Hillcrest home repairs | 5,000 |
| Back payments under 1976 order | 4,000 |
| New car | 6,000 |

taking into account the fact that Ken Hinchey would get a deduction for his alimony payments (the affidavit notes that Mr. Sherwood had not been provided with a copy of the decree).[31] Regardless, we reject this figure.

Thus, we agree with the superior court that the $900,000 figure is appropriate.[32] Since no evidence indicated how this burden was to be distributed temporally, we have made the simplifying assumption that it should be calculated proportionally to that percentage of the total Alagco returns (contract payments and salary) received in a given year.

Having settled on this figure and method of distribution, we assume *arguendo* that Ken Hinchey is correct in his other claims: *i. e.*, that the AMEL loan is worthless, that the Alaska Railroad lease is worthless, that the Alagco payments should be discounted,[33] and that Ken Hinchey's claim (rejected by the superior court) of increased indebtedness in back taxes and other debts is accurate. Given the foregoing, we are of the opinion that the settlement figure is not clearly unjust, as shown in the following modified table:

| Assets | Value | Ken Hinchey's share | Vida Hinchey's share |
|---|---|---|---|
| Hillcrest home | 62,458 | –0– | 62,458 |
| Lakeside house receivable | 39,000 | 20,400 | 18,600 |
| Insurance | 9,094 | 9,094 | –0– |
| Attorney fee refund | 4,541 | 4,541 | –0– |
| Glacier Pilot dividend | 1,000 | 1,000 | –0– |
| 5000 shares Alaska Glacier stock | ? | ? | ? |

| Assets | Value | Ken Hinchey's share | Vida Hinchey's share |
|---|---|---|---|
| 110 shares Peoples Bank & Trust | 3,520 | –0– | 3,520 |
| Alaska Railroad Industrial Park lease investment | --- | --- | --- |
| AMEL loan | --- | --- | --- |
| Alagco – contract payments and salary (present discounted value) | 879,103 | 667,590 | 211,513 |
| Subtotal | 998,716 | 702,625 | 296,091 |
| **Liabilities** | | | |
| Attorney's fees | (25,000) | (15,000) | (10,000) |
| Dental work | ( 2,500) | –0– | ( 2,500) |
| Master's fee | ( 2,238) | –0– | ( 2,238) |
| Back taxes | (100,000) | (100,000) | –0– |
| Other debts | (139,079) | (139,079) | –0– |
| Total Liabilities | (268,817) | (254,079) | (14,738) |
| Second Subtotal | 729,899 | 448,546 | 281,353 |
| **Transfers** | | | |
| Ken Hinchey to Vida Hinchey | (no effect) | (15,000) | (15,000) |
| **TOTAL** | 729,899 | 433,546 | 296,353 |

Thus, as to the property division, we will not disturb the superior court's determination.

■ Turning to the alimony order, we assess its fairness in terms of the income streams to the parties. The complicated nature of Ken Hinchey's financial situation makes this a difficult task; but our calculations, based upon the evidence below, again lead us to conclude that the trial judge cannot be said to have abused his discretion or to have arrived at a clearly unjust conclusion. Our assessment is given in the table below:

---

**31.** *See* note 25 *supra.*

**32.** Our own calculations, based on Mr. Sherwood's testimony that the gain on the sale was about 100%, and that the gain was approximately two-thirds long-term capital gain and one-third short-term capital gain, yield a tax burden somewhat lower than $900,000. We assume that this discrepancy is due to the fact that the $900,000 figure was based on federal and state income taxes, whereas our own calculations involve only federal income taxes, as the state income tax has been repealed. Ch. 1,

§ 2, SLA 1980 (Second Special Session). However, we will still use the $900,000 figure for our opinion, as the decrease in this figure due to the repeal of the state income tax may be offset by the increase due to Ken Hinchey's filing single rather than joint returns in the future.

**33.** As neither party suggested an appropriate discount rate, we have used 10%, although this may be overly generous to Ken Hinchey.

| Year | Ken Hinchey's after-tax income (Alagco contract)* | Vida Hinchey's after-tax income (Alagco contract) | Alimony | Tax on alimony (paid by Vida Hinchey)** | Net alimony | Child support (maximum) | Ken Hinchey's after-tax, after-alimony, after-child support income* | Vida Hinchey's after-tax, after-alimony income |
|---|---|---|---|---|---|---|---|---|
| 1977 | (2,369) | -0- | 22,500 | 4,275 | 18,225 | 9,000 | (29,131) | 18,225 |
| 1978 | 87,120 | 25,000 | 30,000 | 7,522 | 22,478 | 9,000 | 48,120 | 47,478 |
| 1979 | 87,120 | 25,000 | 30,000 | 7,522 | 22,478 | 7,800 | 49,320 | 47,478 |
| 1980 | 87,120 | 25,000 | 30,000 | 7,522 | 22,478 | 7,800 | 49,320 | 47,478 |
| 1981 | 87,120 | 25,000 | 30,000 | 7,522 | 22,478 | 7,800 | 49,320 | 47,478 |
| 1982 | 121,120 | 25,000 | 30,000 | 7,522 | 22,478 | 7,800 | 83,320 | 47,478 |
| 1983 | 125,120 | 25,000 | 30,000 | 7,522 | 22,478 | 6,000 | 89,120 | 47,478 |
| 1984 | 483,218 | 200,000 | 30,000 | 7,522 | 22,478 | 4,200 | 449,018 | 222,478 |
| 1985 | ? | -0- | 30,000 | 7,522 | 22,478 | 4,200 | ? | 22,478 |
| 1986 | ? | -0- | 30,000 | 7,522 | 22,478 | 4,200 | ? | 22,478 |
| 1987 | ? | -0- | 30,000 | 7,522 | 22,478 | 4,200 | ? | 22,478 |
| 1988 | ? | -0- | 30,000 | 7,522 | 22,478 | 4,200 | ? | 22,478 |
| 1989 | ? | -0- | 30,000 | 7,522 | 22,478 | 4,200 | ? | 22,478 |
| 1990 | ? | -0- | 12,000 | 1,603 | 10,397 | 4,200 | ? | 10,397 |
| 1991 | ? | -0- | 12,000 | 1,603 | 10,397 | 4,200 | ? | 10,397 |
| 1992 | ? | -0- | 12,000 | 1,603 | 10,397 | ? | ? | 10,397 |
| 1993 | ? | -0- | 12,000 | 1,603 | 10,397 | ? | ? | 10,397 |

\* This figure would be increased because of the ·$1,000 personal exemption, IRC § 151(b), and the $1,000 deduction Ken Hinchey would presumably receive for each dependent child under IRC § 152(e)(2) B(i) and (ii).

\*\* This figure is calculated from the 1980 tax table at IRC § 1(c) on the alimony after subtracting the $1,000 personal exemption from the alimony amount, IRC § 151(b).

---

Aside from the financial difficulties faced by Ken Hinchey in 1977, there is nothing in the award of alimony which renders the superior court's decision clearly unjust. We note that the order did apparently take the difficulties of 1977 into account: Vida Hin-

chey's alimony for 1977 was only $22,500 rather than the $30,000 ordered for subsequent years; the award for back payments of interim support was limited to $4,000, although the court specifically found that the arrearages were substantially more; and the court apparently agreed with the Master that the sale of the Lakeside home should furnish sufficient proceeds to enable Ken Hinchey to deal with some of the pressing debts.

Thus, we find no abuse of discretion in either the property division or the alimony award. As such, we affirm the superior court's judgment in these respects.

As we have reviewed all of appellant's points and find them to be without merit, the judgment of the superior court is affirmed.

CONNOR, BOOCHEVER and BURKE, JJ., not participating.