H.P.A., Appellant and Cross-Appellee,

v.

S.C.A., Appellee and Cross-Appellant.

Nos. S–197, S–227.

Supreme Court of Alaska.

Aug. 9, 1985.

Rehearing Denied Sept. 16, 1985.

H. Clay Keene, Keene & Currall, Ketchikan, for appellant and cross-appellee.

A. Fred Miller, A. Fred Miller, a Professional Corporation, Ketchikan, for appellee and cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

### FACTUAL AND PROCEDURAL BACKGROUND

H.P.A. (Husband) and S.C.A. (Wife) married in 1974. Two years later, Husband had a vasectomy. The parties were still married when H.P.A., Jr., (Child) was born to Wife in 1978. Despite the arrival of Child under these circumstances, Husband apparently made no special efforts to determine whether he could have fathered Child.

Wife filed for divorce in 1981. In his answer, Husband impliedly admitted he was Child's father and sought custody of Child. A guardian *ad litem* was appointed to represent Child's interests; the court reserved its determination of how the guardian's fees should be allocated between the parties.

In April 1982, Husband moved to amend his answer to the complaint. By this amendment, he sought to deny paternity and, therefore, to deny any legal responsibility for Child. He alleges that he learned he was not the father only after Wife made public declarations that another man had in fact sired Child. Husband's affidavit alleges that the declarations were made before January 15, 1982 and (implicitly) after the Wife filed for divorce. An affidavit of the doctor who performed the vasectomy accompanied the motion. The affidavit stated that "to a reasonable medical certainty ... [H.P.A.] ... could not be the father to a child born to [S.C.A.] ... during October, 1978." The trial court granted the motion to amend in May 1982.

Husband then moved the court to compel blood grouping tests. Argument on the motion was set for August 13, 1982. On that date, however, the trial court focused its attention instead on the May order permitting Husband to amend his answer. The court ruled that the previous order has been improvidently granted, set aside the May 1982 decision and ordered Husband "estopped from raising any issue as to the paternity of the child." This decision was designed to

> prevent a party to the litigation from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken, and the party to the action [who would be disadvantaged] is the youngster.

The court emphasized Husband's conduct treating Child as his own, which conduct occurred prior to the lawsuit and at the initial stages of the action when Husband, in his opening pleadings, sought custody of Child.

The parties held a settlement conference in September 1982, at which time issues concerning property distribution, alimony, child support *pendente lite,* and attorney's fees up to that point were resolved.

In November 1983, the trial court issued its final judgment, embraced in an "Amended Decree of Divorce and Amended Findings of Fact and Conclusions of Law." Husband appeals the order applying equitable estoppel to prevent him from denying paternity, and three provisions of the November 1983 judgment:

1. Husband's obligation to pay one-third (⅓) of Child's college education;

2. Husband's obligation to pay one-half (½) the cost of a $100,000 life insurance policy with Child as beneficiary; and

3. Husband's obligation to increase biennially the monthly child support payments according to the rise in the cost of living reflected in the United States Bureau of Labor Statistics Cost of Living Index.

Wife cross-appeals challenging the portion of the judgment requiring her to pay one-third (⅓) of the guardian *ad litem's* fees, and the portion requiring her to bear her own attorney's fees incurred after the September 1982 settlement.

## DISCUSSION

### I. DID THE TRIAL COURT ERR IN APPLYING EQUITABLE ESTOPPEL TO PREVENT HUSBAND FROM DENYING PATERNITY OF CHILD?

Under normal circumstances it is the biological parents who shoulder the legal responsibility for the welfare of their offspring. *See Division of Family Services v. Clark*, 554 P.2d 1310, 1311 (Utah 1976). There are situations, however, where a person's conduct towards an infant can give rise to a constructive parental relationship such that one can be adjudged a *legal* parent even if not biologically the same. *E.g., Chrzanowski v. Chrzanowski*, 325 Pa.Super. 298, 472 A.2d 1128 (1984); *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416 (1976). Courts have reached this result by invoking equitable estoppel to prevent denial of fatherhood. *Gonzalez*, 369 A.2d 416.

Equitable estoppel is usually employed in a commercial context. *Jamison v. Consolidated Utilities*, 576 P.2d 97 (Alaska 1978). The standard elements required to apply the doctrine "are the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice." *Id.* at 102. Courts have adapted these principles to the domestic affairs/paternity setting and have fashioned a set of criteria to meet before employing an estoppel in cases of this type. *E.g., Clevenger v. Clevenger*, 189 Cal.App.2d 658, 11 Cal.Rptr. 707 (1961). *Clevenger* defined the elements as follows:

1. Representation (direct or implied) of husband to child that he is the father;
2. husband intended his representation to be accepted and acted on by the child;
3. child relied on the representation and treated husband as father and gave his love and affection to husband; and
4. child was ignorant of the true facts.

*Id.* 189 Cal.App.2d 658, 11 Cal.Rptr. at 714. The trial court in the instant case did not explicitly apply the *Clevenger* standards. Essentially, it found a constructive parental relationship created by Husband's fatherly conduct toward Child. Such conduct was the "dispositive" factor leading to imposition of the estoppel.

■ The problem with the court's use of estoppel in this case lies in the absence of factual findings regarding Husband's claims of misrepresentation by Wife. An estoppel should not have been applied as a matter of law based solely on the undisputed fact that Husband treated Child as his own for approximately three and one half years between Child's birth and Wife's filing for divorce. Although the law has a strong interest in protecting infants from parents who abdicate their responsibilities, we must acknowledge the law's equally strong interest in protecting one spouse against the fraud of another. As one court has succinctly expressed the competing values:

> *Absent any overriding equities in favor of the putative father, such as fraud,* the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized.

*Gonzalez*, 369 A.2d at 419 (emphasis added). The possibility that fraud against the husband may be involved here distinguishes this case from those cited by Wife as examples of a spouse being properly estopped to deny paternity. *Morrell v. Giesick*, 188 Mont. 89, 610 P.2d 1189 (1980); *In Re Marriage of Johnson*, 88 Cal.App.3d 848, 152 Cal.Rptr. 121 (1979); *In Re Marriage of Valle*, 53 Cal.App.3d 837, 126 Cal. Rptr. 38 (1975); *Commonwealth ex rel. Hall v. Hall*, 215 Pa.Super. 24, 257 A.2d 269 (1969); *Gonzalez*, 245 Pa.Super. 307, 369 A.2d 416 (1976); *Time v. Time*, 59 Misc.2d 912, 300 N.Y.S.2d 924 (N.Y.Fam. Ct.1969).

■ Without expressing any opinion as to the merits of Husband's allegations of fraud, we reverse the trial court's application of estoppel and remand with instruc-

tions to make the appropriate findings of fact.[1]

## II. DID THE TRIAL COURT ERR IN ORDERING HUSBAND TO PAY ONE–THIRD (⅓) OF CHILD'S COLLEGE EDUCATION COSTS?

AS 25.24.160 provides that in a divorce action, a court may require the parties to make payments "toward the nurture and education of their children." This section does not confer on a court the power to require a party to make payments towards post-majority education, typically college education. *Dowling v. Dowling*, 679 P.2d 480 (Alaska 1984). The trial court included in its Amended Decree of Divorce an order that

> both parties and the minor child share equally in the costs of college education for the minor child. Said costs will include tuition, room, board, books and transportation two (2) times per year to and from the minor's place of residence and the college, which will be one which is selected by agreement between the parties, provided, however, that if the parties cannot agree, then the Court upon application of either or both of the parties, shall determine the college that the minor shall attend.

The language of this provision is ambiguous. Does it simply order Husband to pay one-third of Child's expenses for the period, if any, that Child attends college *during his minority?* Or does it assume Child will go to college after he reaches his majority? Wife's argument assumes that the order covers college costs that might be

incurred during Child's minority. In contrast, Husband's argument assumes that the order refers only to post-majority college education.

Reference to another portion of the decree requiring insurance for Child's benefit suggests that the trial court envisioned college *after* majority:

> [In] the event the total costs of support to the child's majority and defendant's estimated share of costs of college are less than One Hundred Thousand Dollars ($100,000) upon the defendant's death, then in that event, the balance shall be paid over to defendant's estate....

(emphasis supplied). This passage, however, is inconclusive. Further reference to the trial judge's explanatory remarks upon rendering his decision does not clarify the point:

> I would note that I expect that [Child] would attend college; he's an exceptionally bright child; his parents attended college; his parents planned for him to go....

Because college begins for the vast majority of undergraduates around the age of majority (18), we think it appropriate to interpret the order as Husband does, despite the uncertainty.

 In reaching its decision, the trial court emphasized the parties' contributions to a fund designed partially to pay future college expenses. The court felt empowered by the existence of the fund to make this order, as if it were merely giving effect to the manifested intentions of the parties.[2] The court has overestimated the

---

1. Wife argues that Husband's "gross negligence" caused his unawareness that another fathered child; paternity was not questioned in a timely manner; therefore, due to the inexcusable delay he should not be permitted to raise the challenge. This laches argument must fail *if* the trial court finds Husband was defrauded. The time to raise an objection starts when one knows or should know of a wrong. *Sharrow v. Archer*, 658 P.2d 1331, 1334 n. 6 (Alaska 1983). Had Husband been defrauded by Wife, in the manner he urges, he would not have known that someone else fathered Child until late 1981 or early 1982. He attempted to deny paternity with a motion to amend in April 1982. Under

those circumstances, Wife could be estopped to raise the issue of Husband's delay. *Cf. Chiei v. Stern*, 561 P.2d 1216, 1217 (Alaska 1977) ("[A] party who fraudulently conceals from a plaintiff the existence of a cause of action, may be estopped to plead the statute of limitation if the plaintiff's delay in bringing suit was occasioned by reliance on the false or fraudulent representations.").

2. The court stated:

> I believe that it is appropriate that if [Child] goes on to college, the expenses should be shared as plaintiff suggests. That is equally by the plaintiff, the defendant, and

extent of its own powers. If Husband and Wife had contracted to share the costs of Child's college education the court could certainly enforce that voluntarily assumed obligation. No such contract is involved here. The rule of *Dowling* is clear and cannot be ignored: when a husband and wife with children divorce, the court cannot require either parent to pay for post-majority college education.[3]

### III. DID THE TRIAL COURT ERR WHEN IT ORDERED HUSBAND TO PAY ONE–HALF (½) THE COST OF A $100,000 LIFE INSURANCE POLICY TO SECURE HIS SUPPORT OBLIGATIONS OWED TO CHILD?

The relevant portion of the divorce decree provides:

IT IS FURTHER ORDERED that until the minor child has graduated from college or has reached the age of twenty-five (25) years, defendant shall be responsible for maintaining upon his life a term life insurance policy in the face amount of One Hundred Thousand Dollars ($100,000.00), payable upon his death to plaintiff in trust for the minor child; provided, however, that the premiums for said insurance shall be shared equally by the parties. The costs of plaintiff's share of the premium shall be deducted from alimony payments so long as such payments are due; thereafter, plaintiff shall pay to defendant, upon request by defendant, her portion of the premium prior to its payment by defendant and provided further, that in the event the total costs of support to the child's majority and the defendant's estimated share of costs of college are less than One Hundred Thousand Dollars ($100,-000.00) upon defendant's death, then in that event, the balance shall be paid over to defendant's estate....

Husband attacks this award by arguing that married parents have no legal obligation to secure the future support of their children, so it should follow that divorced parents do not have that obligation either. This reasoning is based on the principle that the duty to support one's children ceases upon a parent's death. *Hutchings v. Bates*, 406 S.W.2d 419, 420 (Tex.1966); *see Jacobs v. Gerecht*, 6 Cal.App.3d 808, 86 Cal.Rptr. 217 (1970). Wife counters that life insurance which functions as *security* for child support, rather than a property disposition in addition to support, is permissible. Other courts have approached the issue as Wife suggests. *E.g., Riser v. Riser*, 7 Wash.App. 647, 501 P.2d 1069, 1071 (1972) ("A father may not be required to take out or maintain life insurance for the benefit of his children in addition to support and maintenance.... This rule does not mean that the support and maintenance obligation may not be secured by a life insurance policy on the life of the father...."). Because a divorce can raise special concerns about the financial support of children, we approve the use of insurance as security for a support obligation where appropriate.[4]

---

[Child].... *I would not, under Alaska law in the cases I've read, but for the fact that the parents have already made substantial contributions to [Child's] present estate, at least partially to cover the necessity for college expenses* ....

(emphasis supplied).

**3.** Wife attempts to circumvent the rule of *Dowling* by invoking the "inherent equity powers" of a court to provide post-majority educational support. We do not agree that a court is invested with such inherent authority; moreover, if Wife were correct, we would have to reconsider *Dowling*, which we are not prepared to do.

We further note that this issue was raised in a timely fashion on appeal; our holding should in no way be construed as requiring or permitting that all decrees providing for post-majority educational support are subject to modification because of *Dowling*.

Finally, our comments are not intended to question Judge Carpeneti's observance of controlling precedent. When he rendered his decision, *Hinchey v. Hinchey*, 625 P.2d 297 (Alaska 1981), stated the controlling precedent. *Dowling* subsequently overruled *Hinchey* and we now adhere to its mandate.

**4.** Regarding the amount and type of insurance to be procured, we leave to the ingenuity of lawyers, judges, insurance brokers and actuaries the determination of these particulars, depending on individual cases. Practicality sug-

Having said this much, we must modify the trial court's order in light of the preceding discussion of *Dowling*. The provision requiring maintenance of the insurance policy until Child graduates from college or reaches twenty-five (25) years apparently is designed to insure payments for post-majority college costs. To this extent the order is disapproved; what cannot be done directly cannot be done indirectly. Therefore, we modify the order to require maintenance of the insurance until Child reaches eighteen (18) years of age.

IV. DID THE TRIAL COURT ERR IN ORDERING HUSBAND TO ADJUST BIENNIALLY HIS SUPPORT PAYMENTS ACCORDING TO THE RISE OR FALL IN THE COST OF LIVING INDEX?

The Amended Decree of Divorce provides in pertinent part:

IT IS FURTHER ORDERED that the reasonable costs attributable to the child as determined in the Transcript of Decision attached as Exhibit "C" and by reference made a part hereof, totals Fifteen Thousand Fifty-four Dollars ($15,054.00), and the defendant shall be responsible for one-half (½) of these projected costs, with the defendant making such a payment on the first day of each and every month following the entry of the final decree in the amount of Six Hundred Twenty-seven and 25/100ths Dollars ($627.25), *subject, however, to biennial adjustment in the amount to be paid equal to the increase or decrease, as the case may be, in the average cost-of-living for the two (2) years immediately preceding the period for which the ad-justment is made, as computed by the UNITED STATES BUREAU OF LABOR STATISTICS for the region which included Ketchikan, or the closest region to Ketchikan for which such information is compiled.*

(emphasis added).

This court has held that a support order can be modified only where there has been a material and substantial change in circumstances occurring subsequent to the original order. *Curley v. Curley*, 588 P.2d 289 (Alaska 1979). If the automatic adjustment constitutes a modification without a judicial determination of changed circumstances it runs afoul of *Curley*. This is the heart of Husband's challenge.

We disagree with Husband on this issue. Linking the adjustment of support obligations to an accepted and reliable indicator such as the Cost of Living Index simply maintains the buying power of support payments at the same level as the original award. We are not persuaded by the argument that the built-in adjustment impermissibly shifts the burden of proving changed circumstances to the non-custodial parent, i.e., *he* will be required to demonstrate to the court that his earnings have not kept pace with the changes reflected in the Cost of Living Index, instead of Wife being required to show that inflation has eaten away at the value of the support received.

Approving an adjustment to keep pace with inflation enables the court to put the interests of the child first. The child's interests will be best protected if the custodial parent can depend on a steady income of unchanging buying power. Where the non-custodial parent has suffered a serious

gests the appropriateness of such flexibility. In the instant case, review of the amount and type of insurance by the trial court may disclose the advisability of further modifications. For example, the trial court may consider discounting $100,000 to present value to reach the needed amount of coverage. Additionally, the comparative advantages of term as opposed to whole life insurance deserve contemplation. These are only two factors to consider and by no means limit the parties or the court in arriving at the most suitable and cost-efficient plan.

Our approval of this means of securing a child support obligation is not intended to prevent resourceful and creative lawyers and judges from employing other means to achieve the same result. For example, a court could choose, in its exercise of sound discretion, to divide property at the time of divorce to achieve the same purpose. Such a distribution should, of course, be explained by clearly articulated reasons.

loss because his (or her) earnings have not risen along with inflation, he can make that showing and get relief from the court. We affirm the trial court's biennial adjustment provision.

### V. DID THE TRIAL COURT ABUSE ITS DISCRETION IN ORDERING WIFE TO PAY ONE–THIRD (⅓) OF THE GUARDIAN *AD LITEM*'S FEES, AND TO BEAR ALL HER ATTORNEY'S FEES INCURRED AFTER THE SEPTEMBER 1982 SETTLEMENT?

#### A. Guardian *Ad Litem*'s Fees.

■ AS 25.24.310(b) governs the payment of a guardian *ad litem*. That section provides in pertinent part:

> If custody, support, or visitation is an issue, *the order for costs, fees and disbursements shall be made against either or both parents.... The court shall, if possible, avoid assigning costs to only one party* by ordering that costs of the child's legal representation or other services be paid from proceeds derived from a sale of property belonging to both parties, before a division of property is made.

(emphasis added). This court recently interpreted the section to prevent "the superior court from taxing only one parent with the costs of a guardian ad litem where both parents can afford the cost." *Siggelkow v. Siggelkow*, 643 P.2d 985, 990 (Alaska 1982). The superior court has discretion whether to appoint a guardian *ad litem* and how to arrange for payment of costs. *Id.* at 989–90. The question reduces to whether the trial judge abused his discretion in requiring Wife to pay one-third of the costs.

■ We do not think there was an abuse of discretion. Wife received real property valued at approximately $250,000 and $48,400 in alimony payable at $400.00 per month over ten (10) years. Husband did receive stock with a value, apparently, exceeding $3,000,000.

The guardian *ad litem* spent fifty-five hours on the case and the court fixed compensation at $75.00 per hour. The fee comes to $4,125.00. Wife's one-third share comes to $1,375.00. Wife can reasonably afford to pay this amount. The trial court gave effect to the statutory command, and *Siggelkow*, by allocating the guardian *ad litem* fees in this manner. We affirm the trial court's order.

#### B. Attorney's Fees and Costs Incurred After the September 1982 Settlement Conference.

■ AS 25.24.140(a) empowers a court to require one spouse to pay another spouse's attorney's fees and costs. The section provides in pertinent part: "During the pendency of the action, the court may provide by order (1) that one spouse pay an amount of money as may be necessary to enable the other spouse to prosecute or defend the action...." Whether to make such an award rests with the discretion of the court. *Siggelkow*, 643 P.2d at 988–89. Furthermore, in a divorce action, the "prevailing party" standard of Civil Rule 82 does not apply. *Id.* The court should consider the "parties' relative economic situations and earning powers...." *Burrell v. Burrell*, 537 P.2d 1, 7 (Alaska 1975). The trial court here determined that both parties enjoyed "substantial resources."

■ The crux of Wife's argument is that Husband has a lot more money and greater earning power, and he can much more easily afford to pay her attorney's fees. He points out that she anticipates being able to contribute to the insurance policy on his life, and being able to pay one-third of Child's college education costs. She has training in landscape architecture and has experience doing drafting work. A witness at trial estimated that these skills could earn her $18,000–$20,000.00 a year. Assuming that Husband possesses greater financial resources and greater earning capabilities, Wife's resources and capabilities are sufficient enough that a court could reasonably expect her to pay her own fees. We affirm the trial court's order.

To conclude, we reiterate that the order estopping Husband to deny paternity is reversed, and the case remanded to the superior court to hold a trial and make findings of fact regarding the disputed events.

AFFIRMED in part, REVERSED in part and REMANDED.

MATTHEWS, Justice, joined by RABINOWITZ, Chief Justice, dissenting in part.

I disagree with the majority's conclusion that the trial court lacked the power to require either parent to pay educational support to adult children for the reasons expressed in *Dowling v. Dowling*, 679 P.2d 480, 483 (Alaska 1984) (Matthews, J. dissenting) and in *Hinchey v. Hinchey*, 625 P.2d 297 (Alaska 1981). In all other respects I agree with the opinion of the majority.