Dianne **WANBERG**, Appellant,

v.

John **WANBERG**, Appellee.

No. 6219.

Supreme Court of Alaska.

May 13, 1983.

---

William T. Ford, Anchorage, for appellant.

John S. Hellenthal, Anchorage, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This is an appeal of a property division entered by the superior court. The court awarded Dianne Wanberg property and rehabilitative alimony in the approximate total amount of $52,500, in the context of a marital estate valued at approximately $704,450.[1] Dianne challenges the division as an abuse of the superior court's discretion.

The Wanbergs were married for five and one-half years. John Wanberg entered the marriage with substantial assets, consisting chiefly of various real property holdings.[2] Dianne calculates John's net worth as $366,000 at the time of their marriage,[3] while John claims that the correct figure is $600,000.[4] It is undisputed that Dianne's net worth was $38,000 at the time of the parties' marriage, consisting of clothing, jewelry, and other personal property.

Statutory criteria governing the disposition of property in divorce actions are found in AS 09.55.210(6), which provides:

> In a judgment in an action for divorce or action declaring a marriage void or at any time after judgment, the court may provide
>
> . . . .

---

1. The factual questions of the valuation of John Wanberg's estate at the time of marriage, and of the full marital estate at the time of the property division, were hotly contested at trial, and were never resolved by the trial court. In its Findings of Fact and Conclusions of Law, the superior court made specific findings with respect to the values of only some of the properties held by Dianne and John Wanberg.

2. John owned thirteen separate real estate parcels, a Ford van, and a Cessna 182 airplane in May 1975.

3. Dianne presents alternate calculations that John's net worth in May 1975, was $274,450, and $376,033.

4. John's alternate calculation is set forth in his brief without any supporting documentation from the record. John brought to trial a list of pre-marital assets and assigned valuations totalling $366,000. Although the list was marked as "Defendant's Exhibit B," and John's counsel stated his intention to introduce the exhibit during the trial, it was never made part of the record.

(6) for the division between the parties of their property, whether joint or separate, acquired only during coverture, in the manner as may be just, and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property of either spouse acquired before marriage when the balancing of the equities between the parties requires it ....

In this appeal, Dianne Wanberg challenges the failure of the superior court to include certain items of property in the base of properties it concluded were subject to distribution. Dianne contends that the superior court erroneously excluded property acquired after the marriage from the property base. She also claims that the bulk of John's pre-marital holdings should have been made subject to equitable division, because during the marriage these assets were treated by them as joint holdings.[5]

### A. Standard of Review

The standard of review applied by this court in property division cases is to determine whether the trial court's division was within the broad discretion granted by AS 09.55.210(6). We have held that a distribution made within the perimeters of AS 09.55.210(6) will not be disturbed unless it is clearly unjust.[6] There is a separate question to be asked by this court on review, however, and that is whether the trial court applied the correct legal standard in the

exercise of its broad discretion. With respect to legal analysis employed at the trial court level, review is based upon our independent judgment. *Walsh v. Emerick,* 611 P.2d 28, 30 (Alaska 1980); *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979) ("[o]ur duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy").

Equitable division of marital assets by the superior court involves a three-step procedure. First, the trial court must determine what specific property is available for distribution. Second, the court must find the value of this property. Third, it must decide how an allocation can be made most equitably.[7]

The first stage of the process is in large part a legal determination, involving the interpretation of AS 09.55.210(6), and applying legal principles to the facts of the case. AS 09.55.210(6) places all property acquired during the marriage, "whether joint or separate," before the court for purposes of division.[8] Furthermore, the statute authorizes invasion of pre-marital holdings of either spouse "when the balancing of the equities between the parties requires it." We have held that the trial court has broad discretion with respect to invasion of pre-marital assets, and that decisions to invade will not be overturned absent a clear abuse of discretion.[9]

---

**5.** Dianne asserts that, "*all* the parties' assets were treated as marital assets throughout the marriage; no effort was ever made to separate John's pre-marital properties and through Dianne's efforts in managing and preserving his other assets, she enabled John to keep his pre-marital properties intact."

**6.** *Rosson v. Rosson,* 635 P.2d 469, 471 (Alaska 1981); *Hinchey v. Hinchey,* 625 P.2d 297, 304 (Alaska 1981); *Malone v. Malone,* 587 P.2d 1167 (Alaska 1978); *Bailey v. Bailey,* 567 P.2d 315, 316 n. 1 (Alaska 1977); *Hager v. Hager,* 553 P.2d 919, 924 (Alaska 1976); *Courtney v. Courtney,* 542 P.2d 164, 169 (Alaska 1975); *Burrell v. Burrell,* 537 P.2d 1, 4 (Alaska 1975); *Vanover v. Vanover,* 496 P.2d 644, 645 (Alaska 1972); *Crume v. Crume,* 378 P.2d 183, 186 (Alaska 1963).

**7.** *Compare* the New Jersey Supreme Court's decision in *Rothman v. Rothman,* 65 N.J. 219, 320 A.2d 496, 503 (N.J.1974).

**8.** Prior to amendment in 1968, AS 09.55.210(6) provided for the equitable division of all property owned by both spouses, whether jointly or separately held, and whether acquired before or after coverture. In *Vanover,* we examined the amendments to AS 09.55.210(6) against the backdrop of its earlier form. We concluded that the 1968 amendments should not be read "as circumscribing in any significant manner the broad discretion which we have heretofore found vested in the trial court in regard to property division matters." 496 P.2d at 648.

**9.** *Vanover v. Vanover,* 496 P.2d 644, 647, 648 (Alaska 1972); *Ross v. Ross,* 496 P.2d 662, 664–65 (Alaska 1972). In *Burrell v. Burrell,* 537 P.2d 1, 6 (Alaska 1975), we ordered inva-

In limited circumstances invasion of one spouse's property acquired before coverture may be required as a matter of law.[10] One such circumstance is where the parties, by their actions during marriage, demonstrate their intention to treat specific items of property as joint holdings, even though the properties were separately held by one or another spouse prior to coverture. Such intention is manifest when both spouses can be shown to have taken an active interest in the ongoing maintenance, management, and control of specific assets.[11] Where such circumstances exist, basic fairness requires that property treated by the spouses as jointly held be available for equitable division under AS 09.55.210(6).

## B. *Property Subject to Division*

We must first decide whether the superior court correctly determined which properties would be subject to equitable division, and which would not. We hold that the court erred in concluding that AS 09.55.210(6) authorized exclusion of four of the items of property from the base of marital property subject to distribution, because we conclude that the property was either a post-coverture acquisition within the meaning of AS 09.55.210(6), or was treated as a joint holding by the Wanbergs during their marriage.

### 1. *Grandview Heights five-plex*

John Wanberg owned the Grandview Heights property before marrying Dianne. In 1976, the Wanbergs negotiated a loan to build a five-plex on this property. John and Dianne collaborated in making design decisions on the five-plex, and together they made alterations in the rental units and the owner units.[12] Construction was complete by November 1976, and the Wanbergs made the building their personal residence. In December 1976, the Wanbergs negotiated a permanent loan on the five-plex. Both spouses' names were on the deed of trust note.[13] During the time that the Wanbergs owned the five-plex, Dianne did janitorial work in the units and common areas, advertised vacancies, showed units,

---

sion of pre-marital assets where the superior court had declined to invade. There are no cases currently in Alaska law where a trial court's ruling was overturned for improper invasion of pre-coverture property. In *Vanover,* we stated that the standards regarding the trial court's discretion in determining whether to invade precoverture property are the same as those applied to the actual property division.

**10.** It might be said that under certain conditions the trial court has no discretion to refuse to invade or, alternatively, that some fact situations are sufficiently compelling that a refusal to invade is clearly unjust. *See Burrell v. Burrell,* 537 P.2d 1, 6 (Alaska 1975). In *Burrell,* the husband inherited a potentially valuable interest in a large California estate while still married. 537 P.2d at 2–3. The trial court treated this estate as premarital property, and declined to invade it in making the property division. *Id.* at 3. On review, we did not question the trial court's theory that the inheritance was to be classified as a pre-coverture asset, *id.* at 6 n. 15, but held that "a just division of the property of the parties required invasion of Homer's separate property, i.e., his California property, and the award of some portion of Homer's interest in this property to Teresa." *Id.* at 6 (footnotes omitted).

**11.** In *Rosson v. Rosson,* 635 P.2d 469 (Alaska 1981), we upheld a nearly equal division of marital assets made by the trial court based upon its finding that "it was the intent of the parties to treat all property, whether initially separate or joint, as joint property . . . ." *Id.* at 470. In approving the trial court's analysis, we noted that there was unimpeached testimony to the effect that the spouses "agreed that they would 'just put everything in one pot and go to work,' not worry[ing] about what went where.' " *Id.* at 471. In our opinion we alluded to the fact that there was evidence "indicating that the parties considered themselves one economic unit." *Id.*

**12.** Dianne testified that, "We made constructual changes on our unit, and John and I basically did everything together . . . . So we—on the units below, we approved what, or disapproved what [the builder] had picked in cabinets, flooring, lighting, the whole thing—bathroom—the whole concept."

**13.** Dianne testified that, "I was on the mortgage for the five-plex; I had to sign for the $120,000 debt. . . . Whenever John had to borrow money, I went down and signed my name for him."

entertained prospective tenants and collected overdue rents.[14]

The trial court treated the Grandview property primarily as a pre-coverture asset not subject to equitable division, with the exception of appreciation attributable to the combined efforts of the parties. According to the court's findings, the Grandview lot had a net increase in value of $31,100 during the years of the Wanbergs' marriage, but that only $11,000 of this was a consequence of the erection of the five-plex on the property.[15] Apparently in recognition of the fact that the five-plex was a joint project of the Wanbergs, the court awarded Dianne $5,500 based upon her share of the "marital asset equity" in the Grandview property.

We hold that the entire equitable value of the Grandview property and five-plex should have been considered by the court in determining this portion of the division.[16] The Wanbergs consistently combined their efforts in improving and managing the property, and used the building as their joint personal residence for nearly two years. Although Dianne's name never appeared on the title to the Grandview lot, she signed jointly with John when a permanent $120,000 loan was taken against the property. Under these circumstances, we hold that it was an abuse of discretion for the trial court to shield the property from equitable distribution merely by affixing to the property the label of "pre-marital asset." There may well be reason for granting less than an even share in this property to Dianne, but we hold that such a determination must be made through the exercise of the trial court's equitable discretion, to be guided by the factors relevant to such determinations, and to be articulated in terms of those factors.

### 2. Gambell Street properties

John Wanberg owned two commercial buildings on Gambell Street, which the parties have designated Gambell 1 and Gambell 2. Gambell 1 had two commercial tenants, and also served as the Wanbergs' residence in the early months of their marriage, until November 1976. Gambell 2 also had two commercial tenants. During the years of 1975 and 1976, Dianne contributed to the general management of the two Gambell properties. She worked on the remodeling and redecorating of Gambell 1, entertained tenants, helped with general maintenance, collected rents, accounts payable, paid bills, kept records for the business, and prepared information for the Wanbergs' accountants. Through 1978, while the Wanbergs were not living in Gambell 1, Dianne continued to help with the management of the Gambell properties, collecting rents, and doing bookkeeping for the rental space. Late in 1977, the Gambell properties were placed on the market, and Dianne cleaned the properties in order to put them in saleable condition. In 1978, when other properties owned by the Wanbergs had been sold, Dianne persuaded John not to sell the Gambell properties.[17] In the same year, the Wanbergs moved back into Gambell 1, after making substantial improvements in the owner unit.

The trial court did not make findings regarding the value of Gambell 1, at the time of the Wanbergs' marriage, or at the time of their divorce, and did not calculate the property's overall increase in value during the marriage. Instead, the court found

---

**14.** Dianne testified that she, rather than John, would make personal contact with renters who were overdue with their payments because "maybe I have a softer way of doing it."

**15.** Relying upon the superior court's findings, we have calculated the net gain in the value of the lot as follows:

| | | |
|---|---|---|
| Sale price of lot and five-plex | | $208,000 |
| Out-of-pocket cost of five-plex | – | 158,900 |
| Value of lot at marriage | – | 18,000 |
| Net gain | | $ 31,100 |

**16.** The trial court found that the sales price of the five-plex was $208,000. To the extent that this represents equity value in the property at the time of sale, the full proceeds should be subject to allocation by the court under AS 09.55.210(6).

**17.** Dianne claims that she intervened to stop the sale of the Gambell properties to avoid excessive capital gains liability.

the property gained $25,000 in value "as a result of the parties [sic] efforts during marriage." Any appreciation in excess of this figure the court ascribed to inflation.

Similarly, the superior court did not make findings with respect to the value of Gambell 2 before or after the Wanbergs' marriage, but concluded that the indeterminate increase in the property's worth was "attributable predominantly and almost solely to the phenomenon [of] inflation." [18]

We conclude that, at least with respect to the trial court's treatment of Gambell 1, we must remand for redetermination. As with the Grandview Heights property, Dianne played an important role in the ongoing business affairs associated with Gambell 1, and devoted her energies toward maintaining and improving the property. There is every indication that both parties assumed joint responsibility for the affairs of Gambell 1 as a business enterprise. In addition, Gambell 1 served as the Wanbergs' residence for the greater part of their marriage. We conclude that fairness demands that Gambell 1 not be shielded from the trial court's equitable power of distribution merely because it was a pre-marital asset.

The Gambell 2 property, however, presents a different situation. In its resolution of this case the superior court stated in part that, "I do not credit [Dianne] with having made any significant contribution" to the Gambell 2 property. While Dianne in her brief attempts to show that her degree of involvement with Gambell 2 was on a level with Gambell 1, her testimony at trial undermines this claim.[19] On this record we cannot say that it was an abuse of the trial court's discretion to exclude Gambell 2 from the property division as a pre-marital asset.

### 3. *Arizona townhouse*

In May 1979, the Wanbergs traveled to Arizona and purchased a townhouse in Scottsdale for investment purposes. Dianne and John searched together for a suitable property. Dianne helped select the townhouse that the couple purchased and signed the earnest money agreement. In August of 1979, the Wanbergs returned to Arizona for the closing. John and Dianne stayed in Scottsdale and worked to get the townhouse in shape for rental use. They rented it out for the season. Dianne purchased the furnishings for the building. Once the townhouse was in operation, the Wanbergs scheduled trips to Arizona twice a year for four to six weeks, during which they stayed in their townhouse.

The superior court found that the townhouse was worth $70,000 at the time of trial by splitting "down the middle" the estimates offered by the parties. The purchase price had been $56,500. The superior court found that the townhouse had appreciated in value by $13,500 since its purchase, and divided this sum equally between the parties.

We think that the trial court's action with respect to the townhouse was in error for the following reasons. First, both spouses were sufficiently involved in the purchase and management of the property to require a finding that they considered it a joint holding. Second, it is clear that the townhouse was a post-marital acquisition within the meaning of AS 09.55.210(6), and thus the superior court was not free to exclude any portion of it from the property base subject to equitable disposition. AS 09.55.210(6) mandates that all property ac-

18. The court did recognize that Dianne had made a contribution to the management of Gambell 2, but expressed its belief that this contribution was amply recompensed in other portions of the property award.

19. Dianne's testimony on this point was as follows:

> Q. And what did you have to do with that building, if anything, during the marriage, and the rentals thereof?

> A. The only thing I had to do with that, basically, was the remodeling of the Cosmetic Company, and ... [c]ollecting [rents]—I think we had rental problems with Diver's World after we moved into our five-plex, because I called their accountant all the time and thumbed them for the rent.

quired during coverture, "whether joint or separate," be included among the assets subject to division. Therefore, even absent a finding that the Wanbergs treated the townhouse as a joint possession, we are compelled to remand under the statute for a division of the full equity value of the property.

### 4. Cessna 206 airplane

In September 1976, the Wanbergs purchased a Cessna 206 airplane for $31,950 in cash. The trial court found that the Cessna 206 had neither increased nor decreased in value since its purchase. The court made no award to Dianne based upon the value of the airplane because it concluded that the Cessna 206 "was purchased primarily with proceeds of another premarital asset to-wit, another airplane, a Cessna 182 [owned by John prior to the marriage]."

It is true that John Wanberg owned a Cessna 182 before his marriage to Dianne, which he eventually sold for $11,500. The sale of this airplane, however, occurred nine months after the acquisition of the Cessna 206. Under these circumstances, it was error on the trial court's part to find that proceeds from the Cessna 182 had gone into the purchase of the Cessna 206.

We conclude that the Cessna 206 was an item of property "acquired . . . during coverture" within the meaning of AS 09.55.-210(6), and that it should not have been excluded on this basis from the property division made by the trial court. On remand, the superior court is to exercise its discretion in making a fair apportionment between the parties of the full value of the airplane.

### C. Remand

Earlier we noted that the procedure for a property division in the superior court is comprised of three stages: (1) determining what property is eligible for distribution, (2) determining the value of that property, and (3) making an equitable division. Our analysis in this case has been concerned with part (1) of the above process. With respect to the five-plex, the Arizona townhouse, and the airplane, stage (2) has already been carried out. No valuation has yet been made of the Gambell 1 property, however, and that must be accomplished on remand. Following that, the superior court is directed to make an equitable division based upon the full equity value of each item of property.[20]

The "principal factors" to be weighed by the superior court in reaching a division of property are:

(a) the ages of the parties;

(b) their earning capacity;

(c) the duration of the marriage;

(d) the conduct of the parties during marriage;

(e) their "station in life";

(f) the circumstances and necessities of each;

(g) their health;

(h) their financial condition;

(i) the time and manner of acquisition of the property in question;

(j) the value of the property at the time of division;

(k) the income-producing capacity of the property.

*Merrill v. Merrill*, 368 P.2d 546, 647–48 n. 4 (Alaska 1962). These *Merrill* factors have been consistently reiterated by this court in subsequent opinions.[21] The *Merrill* criteria will be of increased usefulness to a trial court in its determination of an equitable division of property, if the court begins its consideration of the *Merrill* factors with the presumption that the most equitable divi-

---

**20.** Given adequate factual findings, and a demonstration that the trial court weighed those facts in reaching its conclusion, we will not overturn a property division unless it is clearly unjust.

*See supra* note 6, and *Merrill v. Merrill*, 368 P.2d 546, 548 (Alaska 1962).

**21.** *Hinchey v. Hinchey*, 625 P.2d 297, 304–05 (Alaska 1981); *Burrell v. Burrell*, 537 P.2d 1, 4 (Alaska 1975); *Vanover v. Vanover*, 496 P.2d 644, 645 (Alaska 1972); *Stroecker v. Stroecker*, 428 P.2d 384, 386 (Alaska 1967); *Groff v. Groff*, 408 P.2d 998, 1001 (Alaska 1965).

sion of the property is an equal division. This starting point is intended to provide a grounding point by which the relevance of the *Merrill* factors may be determined.

In the past we have held that there is no requirement that the ultimate division made by the trial court must be an equal one. *Rostel v. Rostel,* 622 P.2d 429, 432 (Alaska 1981); *Hurn v. Hurn,* 541 P.2d 360 (Alaska 1975). In no sense do we intend to modify these decisions. The trial courts will still retain broad discretion in assigning weight to the various factual elements highlighted in *Merrill.*[22]

### D. *Conclusion*

With respect to the four items of property discussed in Part B of this opinion, we reverse and remand this case to the superior court for a redetermination of the division of property in conformity with this opinion.[23]

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.

---

**22.** The criteria in *Merrill* are not exhaustive, and thus the trial court is free to consider additional factors which may be relevant in a particular case.

**23.** Because we remand on these substantive issues, we do not reach Dianne Wanberg's claim that the attorney's fee awarded was an abuse of the superior court's discretion.