Karsten P. RODVIK, Appellant,

v.

Maureen O. RODVIK, n/k/a Maureen O'Keefe, Appellee.

No. S–11986.

Supreme Court of Alaska.

Dec. 8, 2006.

340

Fred H. Valdez, Anchorage, for Appellant.

Maureen O'Keefe, pro se, Anchorage, Appellee.

Robert R. Polley, Assistant Public Advocate, and Joshua Fink, Public Advocate, Anchorage, Guardian Ad Litem.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Karsten Rodvik appeals the superior court's resolution of his divorce proceeding. He challenges the trial court's decision granting sole legal and primary physical custody of the couple's three children to his former wife, Maureen. Additionally, he appeals the trial court's decision to order supervised visitation and child support and its award of legal fees to Maureen. He also challenges the trial court's division of property, which resulted in a distribution of marital property favoring Maureen. Finally, he argues that it was error for the trial judge to decline to recuse himself from the Rodviks' divorce proceeding. We affirm the trial court's custody and visitation decision but remand several discrete property issues to the trial court for further findings.

## II. FACTS AND PROCEEDINGS

Karsten and Maureen Rodvik were married in Anchorage in 1990 and separated in 2003. They have three children, ages 13, 11, and 6. Karsten filed a complaint for divorce in January 2004 seeking custody of the three children and child support. Maureen filed an answer and counterclaim for divorce, seeking custody of the children and child support.

During the contentious divorce, Maureen filed for and received a series of protective orders. A domestic violence protective order was issued on October 24, 2003, after Karsten agreed to the entry of the order. In her petition for this protective order, Maureen alleged that Karsten deprived her of sleep, prevented her from leaving, was verbally abusive, drank heavily, struck the children, pushed Maureen, butted her with his shoulder, and grabbed her. Another domestic violence protective order was granted by Superior Court Judge Peter A. Michalski on April 23, 2004, on the grounds that Karsten had refused to return the children after his visitations on multiple occasions and that he contacted Maureen on matters not related to the children in violation of the earlier protective order. The court found by a preponderance of the evidence that Karsten had com-

mitted a crime involving domestic violence against Maureen and that Karsten posed a threat to the physical safety of Maureen or the children. A similar protective order was again issued on November 1, 2004. A fourth protective order was issued on March 2, 2005 by Judge Michalski in connection with his final decision in the divorce.

The parties stipulated to the appointment of a child custody investigator to assist in the evaluation of the children's best interests because the case involved serious allegations of parental behavior problems, including domestic violence and alcohol abuse.

While Maureen was represented by counsel, Karsten represented himself at trial because his attorney withdrew from the proceedings on February 10, 2005 with Karsten's consent. Karsten requested a continuance in order to obtain new counsel, but his request was denied. Karsten did not provide any discovery leading up to trial, even after the superior court issued an order requiring Karsten to respond to the discovery requests of Maureen.

A trial was held from February 28, 2005 through March 2, 2005 before Judge Michalski. In connection with the property division, Maureen submitted a proposed property division, but Karsten did not. Testimony at trial in connection with the property division, discussed more fully below, was based primarily on Maureen's proposed property division. The court awarded Maureen $158,560 worth of property, $12,560 more than the $146,000 value of the property awarded to Karsten.

The trial court heard testimony from Maureen, Karsten, a guardian ad litem (GAL) appointed for the children, an Office of Children's Services investigator, the child custody investigator, the family's pastor, family members, neighbors, one of the children's teachers, and the children's piano teacher. The child custody investigator issued a report, concluding that Maureen bore most of the responsibility for the children over the years, had the most stable source of income, prioritized the children, was organized and responsive to the children's needs, and had largely refrained from criticizing Karsten in front of the children during the divorce.

With respect to Karsten, the custody investigator determined that he was less capable of meeting the children's needs, that he was less responsible for meeting the children's needs during the marriage, that he had an unstable employment history, that he was chronically late, and that, besides the piano lessons, he was less involved in the children's activities than Maureen. The custody investigator also concluded that Karsten "has difficulty separating his emotions from those of his children, insisting that his sadness and despair over the end of the marriage is theirs." She added that "[Karsten's] denial, anxiety, and sense of urgency regarding the divorce interfere with his ability to be emotionally available to the children during this difficult time." The child custody investigator recommended that Maureen be awarded sole legal and primary physical custody.

On June 14, 2005, the superior court issued a decree of divorce and awarded sole legal and primary physical custody of the children to Maureen. In its findings of fact and conclusions of law, the superior court based its decision primarily on Karsten's erratic behavior and the emotional impact that his behavior had had on the children. The trial court also found that Karsten's visits should be supervised.

In order to establish Karsten's income as a piano tuner for purposes of determining child support, Maureen presented an expert witness, a piano instructor, who spoke to the typical volume of business and fees generated by piano tuners. Based on this testimony, the superior court imputed income to Karsten in the amount of $40,000. The court also found that Karsten's "passive-aggressive non-participation and difficulty" entitled Maureen to legal fees.

Maureen filed a motion for entry of additional findings of fact "out of concern that the court's final order not be vulnerable to legal attack." In response, the trial court issued additional findings of fact, stating that the property division, while weighted slightly more in favor of Maureen, was equitable given the fact that Maureen would be caring for the parties' children who "would likely need counseling for years to come." The

additional findings of fact also addressed more specifically how Karsten's denigration of Maureen in front of the children demonstrated that Karsten could not meet the children's mental, emotional, and psychological needs, and how Karsten was unable to foster a relationship between the children and Maureen. The trial court also expressly adopted the recommendations of the GAL.

Karsten appeals the superior court's findings with respect to the property classification and distribution, child custody and visitation, child support, and legal fees. He also argues that Judge Michalski should have recused himself from the divorce proceedings because Karsten had criticized one of the judge's prior decisions on a constitutional issue and Karsten worked to effect a change to the Alaska Constitution to overrule that decision. Karsten was apparently active in the campaign in support of the amendment and was publicly critical of Judge Michalski's decision.

## III.  DISCUSSION

### A.  Standard of Review

■ Trial courts have broad discretion in determining child custody issues.[1] We "will reverse a trial court's custody determination only if we are convinced that the trial court has abused its discretion or that controlling findings of fact are clearly erroneous."[2] We find an abuse of discretion where "the trial court considered improper factors, failed to consider statutorily mandated factors, or improperly weighed certain factors in making its determination."[3] A factual finding is clearly erroneous when a review of the entire record leaves us with a firm conviction that the trial court has made a mistake.[4]

The trial court "has broad discretion in fashioning a property division in a divorce action."[5] Equitable division of marital assets by the superior court involves a three-step procedure.[6] First, the trial court must decide what property is available for distribution.[7] Second, the trial court must value this property.[8] Third, the trial court must decide how to allocate the property in the most equitable manner.[9] We review the trial court's determination of what property is available for distribution under an abuse of discretion standard.[10] The valuation of available property is a factual determination that should be reversed only if clearly erroneous.[11] The equitable allocation of property is reviewable under an abuse of discretion standard and will not be reversed unless it is clearly unjust.[12] The refusal by a judge to recuse himself or herself from a case is reviewed for an abuse of discretion.[13]

### B.  Child Custody and Visitation

#### 1.  The trial court did not err in granting sole legal and primary physical custody to Maureen.

■ Under AS 25.24.150(c), trial courts must make custody determinations in the best interests of the child, considering the following factors:

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

1. *Kinnard v. Kinnard,* 43 P.3d 150, 153 (Alaska 2002).

2. *Id.*

3. *Id.*

4. *Id.*

5. *Cox v. Cox,* 882 P.2d 909, 913 (Alaska 1994).

6. *Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983).

7. *Id.*

8. *Id.*

9. *Id.*

10. *Cox,* 882 P.2d at 913.

11. *Id.* at 913–14.

12. *Id.* at 914.

13. *Hallam v. Alaska Airlines, Inc.,* 91 P.3d 279, 283 (Alaska 2004).

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

The trial court awarded sole legal and primary physical custody of the children to Maureen, emphasizing the impact Karsten's behavior had on the children. The trial judge commented that Karsten had insulted and denigrated Maureen in front of the children in a manner that was emotionally abusive and had "hurt the children in ways it will take them their full maturing to grow from." The trial court concluded that Karsten could not meet the children's emotional and psychological needs and that Karsten could not facilitate communication between the children and Maureen. As further grounds for its conclusion, the court also referred to Karsten's repeated violations of protective orders by contacting Maureen.

The trial court's findings are amply supported by the record. According to the child custody investigator's report, Maureen has shouldered most of the responsibility for the children over the years, has had the most stable source of income, and has largely refrained from criticizing Karsten in front of the children. She has also prioritized the children and is organized and responsive to the children's needs. The custody investiga-

tor determined that Karsten is less capable of meeting the children's needs, was less responsible than Maureen for meeting the children's needs during the marriage, and has had an unstable employment history. The custody investigator also concluded that Karsten "has difficulty separating his emotions from those of his children, insisting that his sadness and despair over the end of the marriage is theirs," and that "[h]is denial, anxiety, and sense of urgency regarding the divorce interfere with his ability to be emotionally available to the children during this difficult time."

The GAL also testified at trial that Karsten made denigrating comments about Maureen in front of the children and discussed the divorce in front of them, and that the children were more frequently absent or tardy when they were in Karsten's care. The GAL testified that Maureen, in contrast, was careful about shielding the children from the impact of the divorce. Because the testimony of witnesses at trial and the recommendations of the GAL and custody investigator support the findings of the trial court, we conclude that Karsten's claims of error are without merit.

2. **The trial court did not err in ordering that Karsten's visitation with the children be supervised.**

■■■ Karsten argues that the GAL's recommendation does not provide evidence justifying supervised visitation. The superior court adopted the recommendations of the GAL and child custody investigator that visits between Karsten and the children be supervised. In adopting the recommendations, the trial court concluded that

> [w]ith respect to the children, there are many many examples of specific things that were problematic, such as the children's tardiness from school and so forth, not actually getting care, which lead this court to find that Karsten's unsupervised contact has, and would continue to have, an adverse effect on the children.

Specifically, the child custody investigator explained her recommendation: "Given [Karsten's] emotional nature and unwillingness to

hear other options regarding the divorce, he is considered to pose some risk[,] and some precautions may need to be taken during this volatile period...." The trial court's order that the visits be supervised is therefore adequately supported in the record and the harm to the children from unsupervised visitation is clearly articulated in its findings.

In *J.F.E. v. J.A.S.*, we held that

the best interests of the child standard normally requires unrestricted visitation with the noncustodial parent. Therefore, an order requiring that visitation be supervised must be supported by findings that specify how unsupervised visitation will adversely affect the child's physical, emotional, mental, religious, and social well-being and the other interests set out at AS 25.24.150.[14]

We also stated that we prefer a "plan by which unsupervised visitation can be achieved." [15]

The recommendations of the GAL suggested that "all contact between Mr. Rodvik and the children be supervised at least until Mr. Rodvik obtains a psychological evaluation." The superior court adopted this plan, stating, "[b]ecause of Karsten's apparent lack of insight into his children's needs, the harm his actions have done to them and the necessity that he comply with rules established by the court, it is in the children's best interests to immediately implement the [GAL's] recommendations...." We conclude that it was reasonable for the superior court to condition resumption of unsupervised visits on Karsten's psychological evaluation and the resulting recommendations of the psychologist. In accordance with our preference for unsupervised visitation, the superior court expressed a willingness to revisit the issue of unsupervised visitation when it stated that "[t]he need for further supervision would be determined based on the findings of the evaluation and Mr. Rodvik's follow-through on any recommendations." Thus, the trial court did not err in ordering supervised visitation

and structuring a mechanism by which Karsten could return to unsupervised visits with the children after undergoing the psychological evaluation.

## C. Property Division

### 1. We remand to the superior court for reconsideration of whether certain items constitute marital property subject to distribution.

Maureen was the only party to submit a proposed property division at trial. Karsten has appended to his brief on appeal a list of property which he alleges was taken by Maureen and not accounted for at trial. Karsten also argues that his medical coverage should have been included in the property division. But Karsten makes this argument for the first time on appeal. Because, "[a]s a general rule, we will not consider arguments for the first time on appeal," [16] we disregard this claim made by Karsten for the first time on appeal. It was not an abuse of discretion for the superior court to consider the property set forth in the exhibits introduced by Maureen to be the universe of the couple's marital property.

Karsten also argues that the trial court erred in separately listing and valuing a depth finder and radio as assets when they were attached to the boat as accessories, and in finding two antique clocks to be marital property. But he did not present any evidence with respect to these items at trial or otherwise make any objections to Maureen's characterizations of these items as marital property when given the opportunity at trial. Thus, Karsten has waived this objection on appeal.[17]

Karsten did, however, testify that the canoe listed by Maureen was premarital property. Maureen also conceded at trial that "the canoe, I didn't remember that ... exact purchase date ... Karsten was indicating he had purchased it before marriage so if that ... is, in fact, the case, then he, obviously, keeps the canoe. That's fine." Exhibit L

---

14. 930 P.2d 409, 413–14 (Alaska 1996).

15. *Fardig v. Fardig,* 56 P.3d 9, 14–15 (Alaska 2002).

16. *Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc.,* 32 P.3d 346, 355 (Alaska 2001).

17. *Lee v. State,* 141 P.3d 342, 352 (Alaska 2006).

lists the purchase date of the canoe as "1990?", the year of the parties' marriage. Given that Karsten's testimony was unequivocal and Maureen allowed that she was not sure when the canoe was purchased and that it could have been premarital property, we remand to the superior court to revise its distribution of property to reflect that the canoe was Karsten's premarital property and thus is excluded from the property division.

■ Karsten also argues that the trial court failed to consider various debts when fashioning its property division. But when asked at trial if his debts were incurred post-separation, Karsten stated that "[t]he only debt I had before this happened was . . . our mortgage . . . a new truck payment and loans against my life insurance policies and maybe 500 to a thou[sand] . . . on [a] credit card." It was therefore not error for the court to decline to include Karsten's credit card debt as marital debt. It does, however, appear that the trial court failed to consider marital debts with respect to Karsten's life insurance and the carpet that was installed during the marriage. Karsten testified about both of these at trial, and neither was included in the final distribution of assets. On remand, the superior court should consider whether these should have been included in the distribution of property as marital debts.

Karsten also claims that the superior court erred in classifying certain of Maureen's debts as marital debt. Maureen testified at trial that Keefe loan No. 2 was given to Maureen after the couple's separation and that the MBNA Visa card reflects a debt for attorney's fees incurred by Maureen after the separation. The superior court's characterization of these as marital debts in the face of uncontested testimony from Maureen that they were not is error, and on remand the trial court should remove these from the marital property distribution.

### 2. The trial court did not err in its valuation of the marital property.

■ The trial court determined that the property values contained in Maureen's pro-

posed division were fair and adopted them. On appeal, Karsten argues that the superior court erred in adopting "wholesale" Maureen's proposed property valuations. Specifically, he disputes the trial court's valuation of some computers and printers, the marital home, Maureen's retirement and annuity accounts, and some ammunition. But Karsten did not object to the valuation of the computers and printers or to the value of Maureen's retirement and annuity accounts at trial, and therefore we will not entertain his objections on appeal.

■ Karsten next argues that the superior court erred in valuing the ammunition at $5,000 and maintains that its true value is $500. The trial court heard conflicting evidence with respect to the value of the ammunition from Maureen and Karsten, and both parties admitted that they were not sure about the amount of the ammunition or its value. It was thus not clearly erroneous for the trial court, after hearing testimony from both parties, to accept the estimate of Maureen over that of Karsten.

Conflicting testimony was also heard about the value of the marital home. Maureen estimated that the net equity in the house was $111,000. This figure was calculated by taking a high value of the market analysis ($346,200) and subtracting the amount of the mortgage ($235,200). Karsten testified that a broker had estimated to him that the most he could "push it would be $330,000," but, unlike Maureen, Karsten provided no documentary evidence to support this valuation. Nor did he offer testimony about the net equity in the home. It was therefore not error for the trial court to credit Maureen's supported testimony over Karsten's unsupported testimony.[18]

### 3. The trial court must supplement its findings to support an uneven distribution of marital property.

18. It is also notable that Karsten submitted a financial declaration on February 4, 2003, when he was represented by counsel, for purposes of determining interim child support. Karsten's declaration stated that the marital home was valued at $350,000, with a $239,000 mortgage, and the net equity of the real estate was listed as $111,000.

Under AS 25.24.160(a)(4),[19] in a divorce action, the court must consider certain statutory factors when dividing property. We have held that "[i]n the absence of findings to warrant an unequal division ... an equal division of the marital estate is presumptively the most equitable."[20]

At trial, Karsten requested that the court move toward a 50/50 distribution rather than the distribution Maureen proposed, which was skewed in her favor. But the trial court made two adjustments to Maureen's proposed division, allocating debt owed to Maureen's family to Maureen and attributing $5,000 worth of ammunition to Maureen after determining that the gun collection should be awarded to Maureen. The trial court valued the allocation as $158,560 to Maureen and $146,000 to Karsten. In doing so, the court noted that "[a]lthough the resulting distribution is not weighted as heavily in Maureen's favor as the one she proposed, it is more than $12,000 in her favor...."

In its order entering additional findings of fact, in response to Maureen's motion, the trial court added the factual finding that "[t]he property division, while weighted slightly in Maureen's favor, is equitable given the fact that Maureen will be caring for the parties' children in the future and the children will likely need counseling for years to come." Karsten challenges this uneven allocation of marital property.

According to Turner's treatise on equitable distribution of property, "the needs of the children should generally not be a factor in determining the amount of marital property assigned to each spouse."[21] Turner cites as support for this statement our decision in *Brandal v. Shangin,* which concluded that "[f]or a trial court to award 'one spouse a greater share of the marital property simply to ease his or her burden of child support constitutes reversible error.'"[22] Turner further suggests that "[p]roperty division should be used to meet the needs of the children only in the presence of a specific reason why this goal cannot be met with an award of child support alone."[23]

We conclude that before the superior court may fashion an uneven distribution of the Rodviks' marital property in Maureen's favor on the basis that "Maureen will be caring for the parties' children in the future and the children will likely need counseling for years to come," it must first determine whether the child support is adequate to meet the children's counseling needs. The need for addi-

---

19. Under AS 25.24.160(a)(4), the trial court is to provide

for the division between the parties of their property, including retirement benefits, whether joint or separate, acquired only during marriage, in a just manner and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property, including retirement benefits, of either spouse acquired before marriage when the balancing of the equities between the parties requires it; and to accomplish this end the judgment may require that one or both of the parties assign, deliver, or convey any of their real or personal property, including retirement benefits, to the other party; the division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:

(A) the length of the marriage and station in life of the parties during the marriage;

(B) the age and health of the parties;

(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of division.

20. *Miles v. Miles,* 816 P.2d 129, 131 (Alaska 1991).

21. BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 8.22 (3d ed.2005).

22. 36 P.3d 1188, 1194 (Alaska 2001) (citing *Arndt v. Arndt,* 777 P.2d 668, 670 (Alaska 1989)).

23. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 8.22 n.3 (3d ed.2005).

tional findings is reinforced by the superior court's child support order, which already requires that Karsten pay half of any of the children's uncovered medical expenses, which could include the children's counseling. We have remanded this case to the superior court for reconsideration of whether certain assets constitute marital property and for redistribution based on its findings. If the superior court deems it necessary to distribute property in either party's favor based on the needs of the children, it must explain why the needs of the children cannot be met with child support alone.

### 4. The trial court did not err in awarding the marital guns to Maureen based on 18 U.S.C. § 922(g) but did err in awarding Karsten's separate property to Maureen.

██ The trial court awarded the entire twenty-one gun collection in dispute to Maureen, ruling that "[g]iven the dictates of 18 U.S.C. § 922(g), the court is compelled not to be putting into Karsten's control anything which would make him a criminal." Karsten argues that the superior court misinterpreted the federal statute and that the statute criminalizes only the receipt of any firearm or ammunition that has been transported in interstate commerce. Karsten contends that he should be awarded the entire gun collection and the ammunition.

In order to determine whether Karsten's argument on division of the gun collection has merit, it is first necessary to examine whether Karsten was permitted to possess any firearms or ammunition under the federal statute at the time the trial court divided the parties' property. 18 U.S.C. § 922(g)(8) states:

It shall be unlawful for any person—

(8) who is subject to a court order that—

(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B) restrains a person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C) (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child; ...

. . . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Prior to the divorce trial, the trial court had issued three protective orders against Karsten upon Maureen's petitions on: October 24, 2003; April 23, 2004; and November 1, 2004. The October 2003 protective order was based on allegations by Maureen that Karsten was verbally abusive, drank heavily, and had struck both Maureen and the children. The April 2004 and November 2004 protective orders were issued after findings that Karsten had violated previous protective orders. In connection with its final order on custody and property division in the divorce, the trial court issued a fourth protective order on March 2, 2005, which was designed to last one year. Although Karsten disputes the interpretation of the statute and its application to him, he does not argue that the protective orders do not meet the criteria listed in 18 U.S.C. § 922(g)(8).

Decisions analyzing 18 U.S.C. § 922(g)(8) have assumed that the statute applies to simple possession of a firearm, as well as receipt of a firearm through interstate commerce.[24] For example, in *United States v.*

---

24. *See, e.g., United States v. Lippman,* 369 F.3d 1039 (8th Cir.2004) (holding that defendant's conviction under 18 U.S.C. § 922(g)(8) for possession of firearms did not violate the Second Amendment); *United States v. Emerson,* 270 F.3d 203 (5th Cir.2001) (concluding that 18 U.S.C. § 922(g)(8) did not violate the Second or Fifth Amendments and defendant's indictment for pos-

*Emerson*, the defendant was indicted for simple possession of a firearm while subject to a restraining order in violation of 18 U.S.C. § 922(g)(8).[25] There, the defendant had purchased the firearm about a year before the restraining order was entered.[26] The Fifth Circuit held that 18 U.S.C. § 922(g)(8) was constitutional as applied to the defendant's possession of a weapon while subject to a domestic violence restraining order.[27] And, in *United States v. Lippman*, the defendant was subject to a domestic violence restraining order against him when he was arrested for possession of two firearms.[28] He was found guilty by a jury of violating 18 U.S.C. § 922(g)(8), and the Eighth Circuit upheld the conviction, concluding that 18 U.S.C. § 922(g)(8) did not violate the Second Amendment.[29] In *People v. Adams*, the New York trial court analyzed whether a defendant, who was subject to a court order of protection, was entitled to a waiver under the probation rules that would allow him to apply for a hunting license and use a hunting rifle.[30] The court examined both state and federal law and determined that "the defendant, for as long as the [court order of protection] is in effect, is barred by 18 U.S.C. [§ ] 922(g)(8) from possessing a firearm, including a hunting rifle."[31] Finally, in *Towell v. Steger*, the Missouri Court of Appeals examined whether to remove an order of protection issued by the trial court, noting that

[u]nder the Federal Gun Control Act, 18 U.S.C. [§ ] 922(g)(8), a person under an order of protection may not possess a firearm, even for recreational purposes. Therefore, Appellant may violate federal laws if he possesses hunting weapons or legitimately hunts. The mere possession of firearms while under an order of protection violates 18 U.S.C. [§ ] 922(g)(8).[32]

Thus, the court recognized a person who is subject to a protective order could not possess a gun.[33]

Karsten has pointed to no case concluding that 18 U.S.C. § 922(g)(8) does not prohibit possession of a firearm or ammunition by a person who is subject to a protective order. As it is not disputed that the trial court entered a valid protective order when it issued the divorce decree, Karsten's possession of any firearm, whether received before the issuance of the restraining order or after, was illegal under the statute. Thus, based on the case law interpreting 18 U.S.C. § 922(g)(8), the superior court was at least reasonable in concluding that federal law imposes a barrier to awarding firearms to Karsten while a protective order is in effect.[34]

Although the trial court did not err in awarding the marital guns to Maureen, we analyze separately the question whether it was error for the trial court to award to Maureen the gun that was Karsten's separate property. There was testimony at trial

session of firearm was permitted); *United States v. Kafka*, 222 F.3d 1129 (9th Cir.2000) (holding that defendant's conviction for possession of firearm was proper and did not violate due process); and *People v. Adams*, 193 Misc.2d 78, 747 N.Y.S.2d 909 (N.Y.Sup.2002) (determining defendant was not entitled to probation waiver to allow him to possess firearm because such possession was not allowed under 18 U.S.C. § 922(g)(8)).

**25.** 270 F.3d at 211–12.

**26.** *Id.* at 212.

**27.** *Id.* at 263–65.

**28.** 369 F.3d at 1040–41.

**29.** *Id.* at 1044.

**30.** 747 N.Y.S.2d at 919.

**31.** *Id.* at 919.

**32.** 154 S.W.3d 471, 475 (Mo.App.2005).

**33.** *Id.*

**34.** Public policy reasons could also have supported the trial court's decision to grant the marital guns to Maureen, even in the absence of the federal statute. Congress had a clear goal of keeping firearms out of the hands of people who had committed acts of domestic violence and made the following legislative findings when it passed the law:

(1) [D]omestic violence is the leading cause of injury to women in the United States between the ages of 15 and 44;
(2) firearms are used by the abuser in 7 percent of domestic violence incidents . . . and
(3) individuals with a history of domestic abuse should not have easy access to firearms.

H.R. REP. No. 103–395 (1993).

that one of the twenty-one guns in the collection was Karsten's separate property. When Karsten was asked at trial if any of the other guns were premarital, he stated "[w]ell, there are others on there that are definitely premarital" but he did not offer further evidence regarding the guns. Karsten identified four guns as his separate property in his motion to reconsider the findings of fact and conclusions of law issued by the superior court. Karsten again argues in his brief on appeal that the four guns are premarital property. Under AS 25.24.160(a)(4), although the trial court is to provide for the division of the property acquired only during marriage, the court, in making the division, "may invade the property . . . of either spouse acquired before marriage when the balancing of the equities between the parties requires it." Ordinarily a decision to invade separate property must be accompanied by specific findings justifying the invasion.[35] But in this case, the trial court stated that it would not award the guns to Karsten based on the federal statute because such an award "would make [Karsten] a criminal." Because the trial court's overriding reason for awarding the guns to Maureen was expressed, we conclude that the trial court's findings are sufficient to justify this limited invasion of Karsten's separate property, consisting of four guns.

### D. The Trial Court Did Not Abuse Its Discretion in Imputing $40,000 of Income to Karsten for Purposes of Determining Child Support.

■■■■■ Karsten argues that the trial court engaged in speculation when imputing $40,000 as his income for purposes of calculating child support. A trial court "has broad discretion to impute income based on 'the most complete evidence before it. . . . This discretion is particularly broad where

the reason for the incomplete record is the parent's own unresponsiveness.' "[36]

Karsten is a self-employed piano tuner. Karsten never provided complete discovery with respect to his income,[37] and he introduces the figure of $36,000 as his actual projected gross income for 2005 for the first time on appeal, with no supporting documentation. At trial, an expert piano instructor testified about the general earning capacity of piano tuners such as Karsten. The expert stated that most piano tuners in the area charge about $100 for a piano tuning visit, noting that this can vary depending upon the level of experience of the technician. The expert further testified that over the long term, a piano tuner can build up a client base so that he can tune three to four pianos per day. The expert conceded under Karsten's cross-examination that Karsten was not a highly skilled expert, which would impact the rates that Karsten was able to charge. But the superior court gave Karsten the opportunity to elicit testimony from the expert that would clarify for the court how much money Karsten could expect to make given his level of skill, and Karsten declined the opportunity. The superior court addressed Karsten, stating: "If he's the expert in the area and knows . . . this business . . . I'll let you ask him what he thinks you would be expected to make if you were working as hard as you could. Do you want to ask him that?" Karsten responded: "No, not really." The expert also testified that piano tuners in the area spent anywhere from twenty to twenty-five percent of their earnings on overhead costs.

In its findings and conclusions, the trial court determined that Karsten could tune two pianos per day at $100 per job. Based on this, the trial court imputed $50,000 worth of gross revenue to Karsten, and adjusted that earning capacity to $40,000 per year for purposes of calculating child support. This

---

**35.** *Murray v. Murray,* 788 P.2d 41, 42 (Alaska 1990).

**36.** *Byers v. Ovitt,* 133 P.3d 676, 682 (Alaska 2006) (citing *Coghill v. Coghill,* 836 P.2d 921, 926 (Alaska 1992)).

**37.** Karsten presented some documents regarding his salary in connection with interim child sup-

port. Karsten's gross monthly income for January 2004 was listed as $2,534.00. For October 2003 through December 2003, his income was listed as $14,705.37. Karsten and Maureen's 2001 joint income tax return, showing an adjusted gross income of $35,874, and their joint 2002 income tax return, showing an adjusted gross income of $34,519 were also included.

figure estimates the number of pianos tuned per day based on Karsten's number of years of experience and skill level and includes a deduction of twenty percent for overhead costs. Because Karsten provided no other evidence with respect to his income at trial, and declined to inquire of the expert how much he could be expected to earn, the superior court did not err in imputing this income to Karsten.[38] However, under Civil Rule 90.3, federal income tax is deductible from the adjusted gross income in order to arrive at the adjusted annual income for child support purposes. Therefore, on remand, the court should ask the parties to brief the question of the appropriate deduction for federal income tax from Karsten's imputed income of $40,000.

### E. The Superior Court Did Not Err in Awarding Maureen Legal Fees.

Under AS 25.24.140(a)(1), a spouse may be awarded expenses, including "attorney fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the action" in divorce proceedings. "The award of attorney's fees in divorce actions is within the broad discretion of the trial court." [39]

The superior court awarded Maureen $10,000 in legal fees based on Karsten's conduct during the course of the litigation. Karsten argues that it was error for the superior court to award Maureen attorney's fees because the parties are of comparable economic standing and should each have borne their own attorney's fees.

In Alaska, "cost and fee awards in a divorce are not to be based on the prevailing party concept, but primarily on the relative economic situations and earning powers of the parties." [40] This is because in divorce

actions "the purpose of awarding attorney's fees is to assure that both spouses have the proper means to litigate the divorce action on a fairly equal plane." [41]

Trial courts also have "the discretion to increase an award of attorney's fees where a party has acted in bad faith or engaged in vexatious conduct." [42] When determining whether bad faith or vexatious conduct warrants an increase in attorney's fees, we explained in *Kowalski* that

> one party's misconduct does not authorize the court to disregard the relative economic situations and earning powers of the parties.... [I]n making an increased fee award, the court must first determine what fee award would be appropriate under the general rule, and only then increase the award to account for a party's misconduct. Failure to follow this two-step process constitutes an abuse of discretion.[43]

We further explained in *Kowalski* that

> the court must make explicit findings of bad faith or vexatious conduct and clearly explain its reasons for deviating from the general rule. When the court finds that one spouse's misconduct has unnecessarily increased the other spouse's costs, the court must identify the nature and amount of these increased costs.[44]

Under these standards, the superior court did not abuse its broad discretion in awarding Maureen attorney's fees. The superior court reasoned that

> [g]iven the kind of passive-aggressive nonparticipation and difficulty, not to mention specific incidents raised by Maureen's counsel in his final argument, it would be fair and appropriate that Karsten contribute in addition to the division of property,

---

38. Karsten also challenges the trial court's findings allocating the expenses for medical costs, child support arrears, and health insurance premiums, but he did not contest these issues at trial and disputes Maureen's figures for the first time on appeal. We therefore decline to address them here.

39. *Kowalski v. Kowalski*, 806 P.2d 1368, 1372 (Alaska 1991) (citing *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987)).

40. *Lone Wolf*, 741 P.2d at 1192 (citations omitted).

41. *Id.*

42. *Kowalski*, 806 P.2d at 1373.

43. *Id.*

44. *Id.*

that Karsten pay $10,000 of Maureen's fees.

Maureen's counsel in his closing offered the following foundation for the award of attorney's fees:

> Now, a cursory glance at the record will demonstrate that even if you leave off the pre-divorce domestic violence action which related to the parties' separation, Mr. Rodvik's vexatious conduct since the beginning of this case has required her to receive two additional long-term protective orders, to ask that he be held in contempt, to ask that the court order the house be sold, to ask that he be ordered to return the children from Minnesota last summer.

We conclude that these specific allegations of bad faith and vexatious conduct, incorporated by reference into the superior court's order, adequately support imposition of attorney's fees in favor of Maureen.

The superior court did not explicitly engage in step one of the two-step process described in *Kowalski*, assessing the relative economic situations and earning powers of the parties. But the record reveals that Karsten and Maureen are of comparable economic standing, as income of $40,000 was imputed to Karsten and Maureen reportedly earned $32,030. We determine that the *Kowalski* standard has been satisfied because implicit within the trial court's findings was a threshold determination of relative equality of the parties' income. This fee award was thus justified by the trial court's finding that Karsten dramatically increased Maureen's litigation costs, affecting her ability to litigate the divorce action on an equal plane.

### F. It Was Not Error for Judge Michalski To Decline To Recuse Himself.

Under AS 22.20.020(a)(9), a judge should recuse himself or herself whenever "the judicial officer feels that, for any reason, a fair and impartial decision cannot be given." A judge's conclusion that he or she can decide the case fairly will constitute an abuse of discretion only when it is "plain that a fair-minded person could not rationally come to that conclusion on the basis of the known facts."[45] In *Perotti v. State*, the court of appeals held that disqualification under subsection (a)(9) is also mandated when, under the circumstances of the case, it is predictable that "an unmistakable appearance of bias will arise from a judge's participation in a case."[46]

On February 10, 2005, Karsten's attorney, Wayne Ross, sent a letter to Judge Michalski requesting that the judge recuse himself. Ross stated that he had come across a law review article which stated that Judge Michalski reached a decision which was the catalyst for the Alaska Marriage Amendment defining marriage as a union between a man and a woman. In the same law review article, Karsten was mentioned in a footnote as the head of a group that was critical of Judge Michalski's decision.[47] The request for recusal was based upon this purported conflict. We conclude that Judge Michalski did not abuse his discretion when he refused to recuse himself under these circumstances. By virtue of holding a judicial office, judges are in a position to render decisions capable of sparking controversy and spirited public comment. It was not an abuse of discretion for Judge Michalski to conclude that he was capable of rendering an unbiased decision despite a litigant's vocal opposition to a decision the judge issued in his official capacity.

## IV. CONCLUSION

We AFFIRM the superior court's determination that Maureen is entitled to sole legal

---

**45.** *Amidon v. State*, 604 P.2d 575, 577 (Alaska 1979).

**46.** 806 P.2d 325, 327 (Alaska App.1991).

**47.** The footnote in the article stated:
See Mary Ann Pease & Karsten Rodvik, Preventing Redefinition of Marriage Doesn't Hurt Anyone, Anchorage Daily News, Oct. 18, 1998, at H4. Professor Mary Ann Glendon of Harvard has described "the habits and attitudes of judges with grandiose visions of judicial authority, practitioners eager to blaze new trails to the nation's crowded courthouses, and legal scholars yearning to be philosopher-kings and -queens." Mary Ann Glendon, A Nation Under Lawyers 282–83 (1994).
Kevin G. Clarkson, David Orgon Coolidge & William C. Duncan, *The Alaska Marriage Amendment: The People's Choice on the Last Frontier*, 16 Alaska L.Rev. 213 n.82 (1999).

and primary physical custody and that supervised visitation pending the outcome of a psychological evaluation is appropriate. With respect to the division of marital property, we REMAND to the superior court for a reassessment of the classification of the canoe, Karsten's debt, and Keefe loan No. 2. We AFFIRM the superior court's valuation of the marital property and its award of the gun collection to Maureen. Because we conclude that the superior court did not offer adequate support for its decision to allocate more than fifty percent of the Rodviks' property to Maureen, we REMAND so that the superior court may set forth its reasoning should it conclude on remand that an unequal distribution of the marital properties is still warranted. Although it was not error for the trial court to impute income of $40,000 to Karsten, we REMAND for consideration of a federal income tax deduction from the imputed income. Because the superior court did not abuse its discretion in determining that Karsten's bad faith and vexatious conduct warranted the imposition of attorney's fees, we AFFIRM that award. Finally, because it was not an abuse of discretion for Judge Michalski to refuse to recuse himself from this proceeding, we AFFIRM his decision not to recuse himself.